Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/19/2017 09:10 AM CST

State of Nebraska, appellee, v.
Kirk A. Botts, appellant.
___ N.W.2d ___

Filed December 19, 2017.    No. A-16-985.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Trial: Investigative Stops: Warrantless Searches: Appeal and Error.** The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.

3. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

4. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

5. **Search and Seizure: Evidence: Trial.** Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.

6. **Search and Seizure: Probable Cause: Appeal and Error.** To analyze the legality of the search and seizure, an appellate court must first determine when the seizure occurred and then address whether the seizure was supported by probable cause.

7. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure: Arrests.** There are three tiers of police-citizen encounters. A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. A tier-two police-citizen encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention. Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.

8. **Constitutional Law: Search and Seizure.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

9. **Police Officers and Sheriffs: Search and Seizure.** In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled.

10. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** An officer's merely questioning an individual in a public place, such as asking for identification, is not a seizure subject to Fourth Amendment protections, so long as the questioning is carried on without interrupting or restraining the person's movement.

11. **Constitutional Law: Arrests: Probable Cause.** The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

12. **Warrantless Searches: Probable Cause: Police Officers and Sheriffs.** Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime.

13. **Probable Cause: Words and Phrases.** Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances.

14. **Probable Cause: Appeal and Error.** An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances.

15. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Reversed and remanded with directions.

Matthew K. Kosmicki, of Brennan & Nielsen Law Offices, P.C., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Inbody, Pirtle, and Riedmann, Judges.

Pirtle, Judge.

## INTRODUCTION

Kirk A. Botts appeals from his conviction for possession of a knife by a felon in the district court for Lancaster County. He challenges the court's overruling of his motion to suppress evidence and statements, its overruling of objections to certain testimony at trial, its use of a specific jury instruction, and its failure to find the evidence insufficient to find him guilty. We conclude that Botts' motion to suppress should have been granted, and therefore, we reverse, and remand with directions.

## BACKGROUND

The State filed an amended information charging Botts with possession of a knife by a felon, a Class III felony. Botts entered a plea of not guilty. He later filed a motion to suppress evidence and statements, and a hearing was held on the motion.

At the motion to suppress hearing, Officer Jason Drager of the Lincoln Police Department testified that on March 10, 2016, around 2:30 a.m., he was driving back to the police station in his police cruiser. While driving, he saw a vehicle on a side street that was not moving and was partially blocking

the roadway. The vehicle was situated at an angle, with the front end by the curb and the back end blocking part of the street. Drager thought maybe there had been an accident. He turned down the street and saw an individual standing by the driver's side of the vehicle. Drager turned on his cruiser's overhead lights, parked his cruiser behind the vehicle, and contacted the individual, later identified as Botts. He asked Botts "what was wrong," and Botts initially told Drager "to mind [his] own business." When Drager asked Botts again about what had happened, Botts told him "he was out of gas and was trying to push the vehicle to the side of the road." Drager testified that he did not recall Botts' saying that he drove the vehicle there. Botts asked Drager if he could help him, and Drager told him he could not help, based on Lincoln Police Department policy.

Drager testified that he decided he should remain at the location because Botts' vehicle was blocking the roadway and could cause an accident. Drager then stood back by his cruiser and watched Botts push the vehicle back and forth. Drager stated that Botts became "verbally abusive" toward him after he said he could not help him, so Drager decided to ask other officers to come to the location "for safety purposes." Three other officers responded.

One of the officers who responded, Officer Phillip Tran, advised Drager that he had stopped Botts a couple hours earlier that night for traffic violations. Drager testified that Tran told him he had detected an odor of alcohol on Botts at the time of the earlier stop. Based on the information from Tran, Drager decided to approach Botts and ask him if he had been drinking. Drager testified that when he asked Botts if he had been drinking, Botts became angry, started yelling, and started backing up away from him.

Drager testified that Botts' demeanor led him to believe Botts was under the influence of "some kind of alcohol or drug." However, Drager testified that he did not believe alcohol or drugs were affecting Botts' ability to answer

questions. Drager did not recall Botts' stating that he had been drinking.

Drager testified that Botts backed up to the other side of the street and stopped with his back against a light pole. When he was backing up, he was not coming at the officers and was not making threats. The four officers surrounded Botts by the light pole. Botts started yelling "something along the line of shoot me, shoot me." Drager testified that Officer David Lopez, one of the officers at the scene, pulled out his Taser for safety purposes and to try to get Botts to comply with their request to put his hands behind his back. He eventually did so and was handcuffed and placed in the back of Drager's cruiser.

Drager testified that the officers were telling Botts to put his hands behind his back for their safety and Botts' safety. Drager stated that he was concerned for his safety because Botts was being verbally abusive.

Drager testified that after Botts was arrested, the officers decided to tow Botts' vehicle because it was blocking the road. He stated that it is Lincoln Police Department policy to search vehicles that are going to be towed. Tran began to search the vehicle and saw the handle of a machete sticking out from underneath the driver's seat. Drager testified that after discovering the machete, Botts was under arrest for being in possession of a concealed weapon.

Tran also testified at the motion to suppress. He testified that he had contact with Botts around midnight on March 10, 2016, a couple hours before Drager made contact with him. Tran testified that he stopped Botts for not having his headlights on and for driving erratically. Tran testified that during that contact, he noticed a "slight odor of alcohol," and that Botts "and another person in the vehicle had just purchased some alcohol." Botts was the driver of the vehicle, and there was more than one passenger. Tran testified that he did not initiate a driving under the influence investigation because he did not see enough signs to believe that Botts was intoxicated.

Tran testified that he and another officer responded to Drager's call for assistance and that when they arrived, he told Drager about his previous contact with Botts. Tran testified that Drager and Lopez then made contact with Botts at his vehicle, at which time Botts' statements and demeanor became erratic. Tran stated Botts backed away from the two officers and was making statements such as "shoot me, kill me, things like that." He also heard Botts make statements indicating the police were harassing him and treating him differently because of his race. Tran testified that Botts backed up and stopped with his back against a light pole and that the four officers were around Botts. One of the officers asked Botts to put his hands behind his back, and Botts responded that he was not doing anything wrong. Tran testified that during that time, Lopez had his Taser out. Botts eventually put his hands behind his back and was handcuffed.

Tran testified that as soon as Botts was handcuffed, he walked over to Botts' vehicle and looked inside the driver's side front window, which was rolled down. He then saw the handle of a machete sticking out from under the driver's seat. He retrieved the machete out of the vehicle after it was decided that the vehicle would be towed. He testified that the officers were required to do an inventory search every time a vehicle is towed.

The State offered exhibits 1 through 3 into evidence, each of which is a DVD containing a video recording from the encounter with Botts. Exhibit 1 was the video recording from Drager's cruiser. Exhibit 2 was the video recording from Drager's body camera. Exhibit 3 was the video recording from Tran's cruiser. The exhibits showed the interaction between Botts and the officers, including Botts' transport to jail. The video recording from Drager's cruiser showed that when Botts was sitting in Drager's cruiser, he saw Tran remove the machete from his vehicle. Botts then began making statements indicating that the machete was his and that he knew it was in his vehicle. Specifically, he stated multiple times that he used the

machete for his business, which involved cutting weeds. Botts also made statements indicating that the vehicle where the machete was found was his vehicle. Botts was never read his *Miranda* rights.

Following the hearing, the trial court overruled the motion to suppress.

A jury trial was subsequently held on the charge. During the trial, Botts renewed his motion to suppress, which was again overruled. Drager and Tran both testified, and their testimony was consistent with that set forth above.

Lopez also testified at trial. He testified that based on information provided by Tran about the earlier stop, the officers thought Botts' vehicle was possibly positioned as it was because he had an alcohol-related accident. Lopez testified that when he and Drager approached Botts and asked if he had been drinking, he became very agitated. It "just didn't seem like he was acting very rational," and he was yelling. Lopez testified that during the encounter, he drew his Taser because of Botts' agitated behavior. He stated the Taser was displayed as a deescalation tactic and as a means to get Botts to comply with their directions. He testified that he did not deploy the Taser and that Botts was eventually handcuffed.

The State also offered exhibits 6 through 8 into evidence. Exhibit 6 was an edited version of Drager's cruiser video recording, exhibit 7 was the machete found in Botts' vehicle, and exhibit 8 was an edited version of Tran's cruiser video recording. Also, the parties stipulated that Botts had a previous felony conviction. Botts did not present any evidence. The jury returned a verdict of guilty, and the court accepted the jury's verdict.

The trial court sentenced Botts to 1 year's imprisonment and to 1 year of postrelease supervision.

## ASSIGNMENTS OF ERROR

Botts assigns that the trial court erred in (1) failing to sustain his motion to suppress, (2) failing to sustain his objections

to certain testimony, (3) giving an erroneous and prejudicial jury instruction, and (4) finding that the evidence was sufficient to support a finding of guilt.

## STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Woldt*, 293 Neb. 265, 876 N.W.2d 891 (2016). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *Id.* The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *Id.*

[3] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress. *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

## ANALYSIS

Botts first assigns that the trial court erred in failing to sustain his motion to suppress evidence obtained as a result of his encounter with Drager and the other officers on March 10, 2016, specifically the machete found in his vehicle and statements he made after he was in Drager's cruiser. He argues that the encounter amounted to a seizure and that the arrest was not supported by probable cause.

[4,5] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Rogers, supra*. Evidence obtained as the fruit of an illegal search or

seizure is inadmissible in a state prosecution and must be excluded. *Id.*

[6] To analyze the legality of the search and seizure, we must first determine when the seizure occurred and then address whether the seizure was supported by probable cause.

*Classification of Police-Citizen Encounter.*

[7] There are three tiers of police-citizen encounters. A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. *State v. Rogers, supra.* Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. *Id.* A tier-two police-citizen encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *Id.* A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention. *Id.* Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution. *State v. Rogers, supra*.

[8-10] A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled. *Id.* But an officer's merely questioning an individual in a public place, such as asking for identification, is not a seizure subject to Fourth Amendment protections, so long as the questioning is carried on without interrupting or restraining the person's movement. *State v. Rogers, supra*.

It is clear that the police-citizen encounter in the instant case began as a tier-one encounter and escalated to a tier-three encounter. The question we must answer is when the encounter became a tier-three encounter, or an arrest. Botts argues that he was arrested for Fourth Amendment purposes when he was standing by the light pole with four officers around him, one with his Taser drawn. The State argues that Botts was not arrested until he was handcuffed.

[11] When Drager and Lopez approached Botts, he became defensive and the situation escalated quickly. He began backing up and was yelling at the officers. All four of the officers on scene followed him across the street until he stopped with his back against a light pole. The officers, all in uniform and armed, were standing around him, and they immediately began telling him to put his hands behind his back. Lopez had his Taser drawn in an effort to get Botts to comply. At this point, there was "the threatening presence of several officers," "the display of a weapon by an officer," and "the use of language . . . indicating the compliance with the officer's request [to put his hands behind his back] might be compelled." See *State v. Rogers*, 297 Neb. at 271, 899 N.W.2d at 632. These circumstances would have made a reasonable person believe that he was not free to leave. We conclude that Botts was seized at that point in time and that such seizure amounted to a tier-three police-citizen encounter. Consequently, for the encounter to be a lawful seizure, the officers needed to have probable cause to believe that Botts had committed or was committing a crime. See *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993) (Fourth Amendment requires that arrest be justified by probable cause to believe that person has committed or is committing crime).

*Probable Cause.*

[12-14] Botts argues that Drager and the other officers did not have probable cause to justify an arrest. Probable cause to support a warrantless arrest exists only if law enforcement

has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013). Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *Id.* An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances. *Id.*

The State contends that the officers had probable cause to believe that Botts had committed the offense of driving under the influence. The evidence showed that Tran had stopped Botts around midnight for traffic offenses and detected a "slight odor of alcohol" and noted that Botts and another person in the vehicle had recently purchased alcohol. Botts was driving, and there were passengers in the vehicle. Tran did not initiate a driving under the influence investigation, because he did not see signs of intoxication. When Drager contacted Botts around 2:30 a.m., about 2½ hours after Tran had stopped Botts, Botts was pushing a vehicle that was inoperable. Botts told Drager that his vehicle had run out of gas and that he was trying to get it to the side of the road. Botts asked Drager for help, and Drager told him he could not help him based on Lincoln Police Department policy. This apparently upset Botts. Botts continued pushing his vehicle and trying to maneuver it to the side of the road while Drager stood back by his cruiser and watched.

It was not until Tran arrived at the scene and told Drager about the earlier stop that Drager decided to approach Botts face to face and ask him if he had been drinking. At this point, all Drager knew was that Tran had smelled an odor of alcohol on Botts and that there was alcohol in the vehicle at the time Tran stopped him. Neither Drager nor any of the officers testified that they smelled an odor of alcohol on Botts. Drager also did not recall Botts' indicating that he had been drinking.

Drager testified that Botts' demeanor led him to believe he was under the influence of alcohol or drugs. However, Botts' demeanor could also be attributed to Drager's telling Botts he could not help him push the vehicle. Drager testified that it was at that point Botts became "verbally abusive" toward him. Botts also indicated that he believed the police were harassing him and that he was being treated differently because of his race.

In addition, Drager did not know if Botts had driven the vehicle to the location where Drager found it. He never saw him in the vehicle, and Botts never indicated that he had been driving the vehicle. The officers did not have probable cause to believe that Botts had been driving under the influence of alcohol.

We conclude that Botts was seized at the time the officers surrounded him by the light pole and Lopez had his Taser drawn and that the officers did not have probable cause to arrest him at that time. Consequently, the trial court erred in overruling Botts' motion to suppress.

[15] Because we have concluded that Botts' motion to suppress should have been granted, we do not address his remaining assignments of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).

## CONCLUSION

We conclude that Botts was arrested without probable cause, resulting in an unreasonable search and seizure in violation of the Fourth Amendment. Therefore, Botts' statements and the evidence seized following his arrest should have been suppressed. Moreover, because the illegally obtained evidence was the only evidence as to Botts' guilt, the cause is remanded with directions to vacate Botts' conviction and dismiss the charge against him.

REVERSED AND REMANDED WITH DIRECTIONS.