Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/04/2018 08:08 AM CDT

State of Nebraska, appellee, v.
Kirk A. Botts, Appellant.
___ N.W.2d ___

Filed May 4, 2018.    No. S-16-985.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Trial: Investigative Stops: Warrantless Searches: Appeal and Error.** The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.

3. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

4. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen, and such encounters are outside the realm of Fourth Amendment protection.

5. **Police Officers and Sheriffs: Search and Seizure.** A tier-two police-citizen encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning.

6. **Police Officers and Sheriffs: Search and Seizure: Arrests.** A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention.

7. **Constitutional Law: Search and Seizure.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

8. **Criminal Law: Warrantless Searches: Probable Cause.** Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances.

9. **Probable Cause: Appeal and Error.** An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances.

10. **Police Officers and Sheriffs: Probable Cause.** In assessing probable cause, an officer's relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts.

Petition for further review from the Court of Appeals, INBODY, PIRTLE, and RIEDMANN, Judges, on appeal thereto from the District Court for Lancaster County, ROBERT R. OTTE, Judge. Judgment of Court of Appeals reversed, and cause remanded with directions.

Matthew K. Kosmicki, of Brennan & Nielsen Law Offices, P.C., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, and FUNKE, JJ., and DERR and URBOM, District Judges.

HEAVICAN, C.J.

## INTRODUCTION

We granted the State's petition seeking further review of the decision of the Nebraska Court of Appeals, remanding the cause with directions to vacate Kirk A. Botts' conviction and to dismiss the charge against him. We reverse the decision of the Court of Appeals and remand the cause with directions.

## FACTUAL BACKGROUND

Botts was charged with possession of a deadly weapon by a prohibited person under Neb. Rev. Stat. § 28-1206 (Reissue 2016). Botts' motion to suppress was denied. Following a jury trial, Botts was convicted and eventually sentenced to 1 year's imprisonment and 1 year of postrelease supervision.

Botts appealed to the Court of Appeals, assigning that the district court erred in denying his motion to suppress. The Court of Appeals agreed, concluding there was not probable cause to arrest Botts and that the inventory search of his vehicle must be suppressed.

### Facts Leading to Arrest and Search.

The Court of Appeals set forth the following facts in its opinion:

Officer Jason Drager of the Lincoln Police Department testified that on March 10, 2016, around 2:30 a.m., he was driving back to the police station in his police cruiser. While driving, he saw a vehicle on a side street that was not moving and was partially blocking the roadway. The vehicle was situated at an angle, with the front end by the curb and the back end blocking part of the street. Drager thought maybe there had been an accident. He turned down the street and saw an individual standing by the driver's side of the vehicle. Drager turned on his cruiser's overhead lights, parked his cruiser behind the vehicle, and contacted the individual, later identified as Botts. He asked Botts "what was wrong," and Botts initially told Drager "to mind [his] own business." When Drager asked Botts again about what had happened, Botts told him "he was out of gas and was trying to push the vehicle to the side of the road." Drager testified that he did not recall Botts' saying that he drove the vehicle there. Botts asked Drager if he could help him, and Drager told him he could not help, based on Lincoln Police Department policy.

Drager testified that he decided he should remain at the location because Botts' vehicle was blocking the roadway and could cause an accident. Drager then stood back by his cruiser and watched Botts push the vehicle back and forth. Drager stated that Botts became "verbally abusive" toward him after he said he could not help him, so Drager decided to ask other officers to come to the location "for safety purposes." Three other officers responded.

One of the officers who responded, Officer Phillip Tran, advised Drager that he had stopped Botts a couple hours earlier that night for traffic violations. Drager testified that Tran told him he had detected an odor of alcohol on Botts at the time of the earlier stop. Based on the information from Tran, Drager decided to approach Botts and ask him if he had been drinking. Drager testified that when he asked Botts if he had been drinking, Botts became angry, started yelling, and started backing up away from him.

Drager testified that Botts' demeanor led him to believe Botts was under the influence of "some kind of alcohol or drug." However, Drager testified that he did not believe alcohol or drugs were affecting Botts' ability to answer questions. Drager did not recall Botts' stating that he had been drinking.

Drager testified that Botts backed up to the other side of the street and stopped with his back against a light pole. When he was backing up, he was not coming at the officers and was not making threats. The four officers surrounded Botts by the light pole. Botts started yelling "something along the line of shoot me, shoot me." Drager testified that Officer David Lopez, one of the officers at the scene, pulled out his Taser for safety purposes and to try to get Botts to comply with their request to put his hands behind his back. He eventually did so and was handcuffed and placed in the back of Drager's cruiser.

Drager testified that the officers were telling Botts to put his hands behind his back for their safety and Botts' safety. Drager stated that he was concerned for his safety because Botts was being verbally abusive.

Drager testified that after Botts was arrested, the officers decided to tow Botts' vehicle because it was blocking the road. He stated that it is Lincoln Police Department policy to search vehicles that are going to be towed. Tran began to search the vehicle and saw the handle of a machete sticking out from underneath the driver's seat. Drager testified that after discovering the machete, Botts was under arrest for being in possession of a concealed weapon.

Tran also testified at the motion to suppress. He testified that he had contact with Botts around midnight on March 10, 2016, a couple hours before Drager made contact with him. Tran testified that he stopped Botts for not having his headlights on and for driving erratically. Tran testified that during that contact, he noticed a "slight odor of alcohol," and that Botts "and another person in the vehicle had just purchased some alcohol." Botts was the driver of the vehicle, and there was more than one passenger. Tran testified that he did not initiate a driving under the influence investigation because he did not see enough signs to believe that Botts was intoxicated.

Tran testified that he and another officer responded to Drager's call for assistance and that when they arrived, he told Drager about his previous contact with Botts. Tran testified that Drager and Lopez then made contact with Botts at his vehicle, at which time Botts' statements and demeanor became erratic. Tran stated Botts backed away from the two officers and was making statements such as "shoot me, kill me, things like that." He also heard Botts make statements indicating the police were harassing him and treating him differently because of his race. Tran testified that Botts backed up and stopped with his back against a light pole and that the four officers were

around Botts. One of the officers asked Botts to put his hands behind his back, and Botts responded that he was not doing anything wrong. Tran testified that during that time, Lopez had his Taser out. Botts eventually put his hands behind his back and was handcuffed.

Tran testified that as soon as Botts was handcuffed, he walked over to Botts' vehicle and looked inside the driver's side front window, which was rolled down. He then saw the handle of a machete sticking out from under the driver's seat. He retrieved the machete out of the vehicle after it was decided that the vehicle would be towed. He testified that the officers were required to do an inventory search every time a vehicle is towed.[1]

*Issues on Appeal and Decision
of Court of Appeals.*

On appeal, Botts contended that the district court erred in denying his motion to suppress. As noted, the Court of Appeals agreed, holding that Botts' arrest was made without probable cause and that the resulting inventory search was invalid. The Court of Appeals remanded the cause with directions to the district court to vacate Botts' conviction:

The State contends that the officers had probable cause to believe that Botts had committed the offense of driving under the influence. The evidence showed that Tran had stopped Botts around midnight for traffic offenses and detected a "slight odor of alcohol" and noted that Botts and another person in the vehicle had recently purchased alcohol. Botts was driving, and there were passengers in the vehicle. Tran did not initiate a driving under the influence investigation, because he did not see signs of intoxication. When Drager contacted Botts around 2:30 a.m., about 2½ hours after Tran had stopped Botts, Botts was pushing a vehicle that was inoperable. Botts told Drager that his vehicle had run out of gas and that he was trying

---

[1] *State v. Botts*, 25 Neb. App. 372, 374-77, 905 N.W.2d 704, 708-10 (2017).

to get it to the side of the road. Botts asked Drager for help, and Drager told him he could not help him based on Lincoln Police Department policy. This apparently upset Botts. Botts continued pushing his vehicle and trying to maneuver it to the side of the road while Drager stood back by his cruiser and watched.

It was not until Tran arrived at the scene and told Drager about the earlier stop that Drager decided to approach Botts face to face and ask him if he had been drinking. At this point, all Drager knew was that Tran had smelled an odor of alcohol on Botts and that there was alcohol in the vehicle at the time Tran stopped him. Neither Drager nor any of the officers testified that they smelled an odor of alcohol on Botts. Drager also did not recall Botts' indicating that he had been drinking.

Drager testified that Bolts' demeanor led him to believe he was under the influence of alcohol or drugs. However, Botts' demeanor could also be attributed to Drager's telling Botts he could not help him push the vehicle. Drager testified that it was at that point Botts became "verbally abusive" toward him. Botts also indicated that he believed the police were harassing him and that he was being treated differently because of his race.

In addition, Drager did not know if Botts had driven the vehicle to the location where Drager found it. He never saw him in the vehicle, and Botts never indicated that he had been driving the vehicle. The officers did not have probable cause to believe that Botts had been driving under the influence of alcohol.

We conclude that Botts was seized at the time the officers surrounded him by the light pole and Lopez had his Taser drawn and that the officers did not have probable cause to arrest him at that time. Consequently, the trial court erred in overruling Botts' motion to suppress.[2]

---

[2] *Id.* at 382-83, 905 N.W.2d at 713.

## ASSIGNMENTS OF ERROR

The State filed a petition for further review, arguing that the Court of Appeals erred in holding that (1) Botts was seized at the time he was handcuffed and not at the time he was surrounded by the officers and (2) Botts' arrest was made without probable cause.

## STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.[3] The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.[4]

[3] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.[5]

## ANALYSIS

*Classification of Police-Citizen Encounters.*

[4-6] There are three tiers of police-citizen encounters. A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen.[6]

---

[3] *State v. Woldt*, 293 Neb. 265, 876 N.W.2d 891 (2016).

[4] *Id.*

[5] *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

[6] *Id.*

Because tier-one encounters do not rise to the level of a sei-zure, they are outside the realm of Fourth Amendment protec-tion.[7] A tier-two police-citizen encounter involves a brief, non-intrusive detention during a frisk for weapons or preliminary questioning.[8] A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention.[9] Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.[10]

[7] A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.[11] In addition to situations where an officer directly tells a suspect that he or she is not free to go, cir-cumstances indicative of a seizure may include the threaten-ing presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compli-ance with the officer's request might be compelled.[12] But an officer's merely questioning an individual in a public place, such as asking for identification, is not a seizure subject to Fourth Amendment protections, so long as the questioning is carried on without interrupting or restraining the per-son's movement.[13]

It is clear that the police-citizen encounter in the instant case began as a tier-one encounter and escalated to a tier-three encounter. The question presented here is when the encounter became a tier-three encounter, or an arrest.

---

[7] Id.

[8] Id.

[9] Id.

[10] Id.

[11] Id.

[12] Id.

[13] Id.

The State contends that the Court of Appeals erred in finding that Botts was arrested for Fourth Amendment purposes when he was standing by the light pole surrounded by four officers, one with his Taser drawn. The State argues instead that Botts was seized for purposes of the Fourth Amendment when Officer Jason Drager approached Botts and asked if he had been drinking—a tier-two investigatory stop for purposes of a driving under the influence (DUI) investigation.

The State's characterization is supported by the record. Drager found Botts attempting to push his vehicle, which had stalled on the side of the road. Botts explained that he had run out of gas, but at the time, Drager had no independent confirmation of that fact. Upon his arrival on the scene, Officer Phillip Tran informed Drager that a few hours earlier, Tran had stopped Botts in his vehicle for driving erratically, driving without his headlights on, and failing to signal his turn. Tran also testified he informed Drager that he had smelled the odor of alcohol coming from Botts' vehicle and that he saw alcohol in the vehicle. In addition, Drager testified at the motion to suppress hearing that Botts' "behavior would have led me to believe that he was under the influence of something, just his demeanor and how upset he was. I would have guessed he was under some kind of alcohol or drug." Based upon his own observations and the information he obtained from Tran, Drager testified that he approached Botts with the intent to begin a DUI investigation.

Although the Court of Appeals concluded that Botts was not seized until later, we conclude that Botts' seizure began at the time Drager approached him to begin the DUI investigation. But this does not end our inquiry.

The Court of Appeals concluded that not only was Botts seized when he was surrounded by officers—and one of those officers drew his Taser—but that Botts was arrested at that time as well. The State disagrees, again contending that Botts was not arrested until he was handcuffed. The State argues that officers are permitted to take such steps as are "'reasonably

necessary to protect their personal safety and to maintain the status quo,'" so that the limited purposes of an investigatory stop may be achieved, and that doing so does not change an investigatory stop into an arrest.[14] In the State's view, all actions taken by the officers in advance of handcuffing Botts fall under this rule.

But in any case, the record shows that about 10 seconds elapsed between the time the officers surrounded Botts and the time Botts was handcuffed. Thus, for purposes of the real issue on appeal—whether there was probable cause to support Botts' arrest—it does not much matter at which of these two points in time the arrest occurred.

*Probable Cause.*

[8,9] The State next contends that the Court of Appeals erred in concluding there was not probable cause to support an arrest. Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime.[15] Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances.[16] An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances.[17]

But, in the words of the U.S. Supreme Court, appellate courts should avoid an "'excessively technical dissection' of the factors supporting probable cause."[18] The test to be employed is

---

[14] Memorandum brief in support of petition for further review for appellee at 9, quoting *United States v. Jones*, 759 F.2d 633 (8th Cir. 1985).

[15] *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

[16] *Id.*

[17] *Id.*

[18] *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 588, 199 L. Ed. 2d 453 (2018).

whether the totality of the circumstances would suggest that probable cause existed.[19] It is improper to view

> each fact "in isolation, rather than as a factor in the totality of the circumstances." . . . The "totality of the circumstances" requires courts to consider "the whole picture." . . . Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation. . . .
>
> . . . .
>
> . . . A factor viewed in isolation is often more "readily susceptible to an innocent explanation" than one viewed as part of a totality.[20]

[10] Thus, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."[21] In assessing probable cause, an officer's "'relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.'"[22]

The Court of Appeals concluded there was not probable cause to support Botts' arrest for DUI. But in reaching its conclusion, the Court of Appeals emphasized that there were innocent explanations for Botts' erratic behavior. Specifically, the Court of Appeals discounted the testimony regarding Botts' demeanor, suggesting that such behavior could be explained by Botts' being upset that Drager was not helping him push his vehicle, and noted that the officers testified they did not know whether Botts had driven the car to the location where it was found. In addition, the Court of Appeals noted that no officers testified they smelled the odor of alcohol on Botts during the latter stop, nor could Drager recall if Botts indicated that he had been drinking.

---

[19] *Id.*

[20] *Id.*, 138 S. Ct. at 588-89 (citations omitted).

[21] *Id.*, 138 S. Ct. at 588.

[22] *Id.*

We conclude that the Court of Appeals erred in discounting the officers' assessment of probable cause based upon innocent explanations for Botts' suspicious behavior. Law enforcement is not required to rule out such explanations when assessing whether probable cause exists.

Botts and his vehicle were found stalled by the side of the road. Botts was acting erratically, and Drager in particular noted that Botts' behavior was suggestive of being under the influence of drugs or alcohol. Tran had notified Drager of the earlier stop of Botts and his vehicle for various traffic violations, that alcohol was present in Botts' vehicle, and that Tran had smelled alcohol during that earlier stop. When considered alongside the escalation of Botts' erratic behavior when Drager asked if he had been drinking, we conclude the officers had probable cause to arrest Botts for DUI. And because there was probable cause to support Botts' arrest, the inventory search of Botts' vehicle prior to its towing was authorized and the machete found in that search admissible.

We observe that the State also argues there was probable cause to arrest Botts for failure to comply with a lawful order. We need not reach that argument, because we conclude probable cause existed for a DUI arrest.

We conclude that the Court of Appeals erred in vacating Botts' conviction. Accordingly, we reverse the decision of the Court of Appeals and remand this appeal to that court to consider Botts' other assignments of error.

## CONCLUSION

The Court of Appeals erred in vacating Botts' conviction. We reverse, and remand with directions.

REVERSED AND REMANDED WITH DIRECTIONS.

STACY, J., not participating.