Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/10/2019 09:08 AM CDT

State of Nebraska, appellee, v.
Steven F. Shiffermiller, appellant.

___ N.W.2d ___

Filed February 15, 2019.    No. S-17-675.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.

3. **Trial: Investigative Stops: Warrantless Searches: Appeal and Error.** The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.

4. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure: Appeal and Error.** To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters.

5. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type

of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection.

6. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Words and Phrases.** The second category of police-citizen encounters, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.

7. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Arrests: Search and Seizure: Probable Cause.** The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

8. **Investigative Stops: Arrests: Time.** A detention may evolve into a de facto arrest if unreasonable force is used or if a stop lasts for an unreasonable amount of time.

9. **Police Officers and Sheriffs: Investigative Stops.** Whether a detention is reasonable under the circumstances depends on a multitude of factors, including the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

10. ____: ____. The use of handcuffs has been approved when it was reasonably necessary to protect officer safety during an investigatory stop, but the use of handcuffs is not warranted when the facts do not justify a belief that the suspect may be dangerous.

11. **Investigative Stops: Time.** An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop.

12. **Police Officers and Sheriffs: Investigative Stops.** In an investigative stop, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

13. **Constitutional Law: Police Officers and Sheriffs: Motor Vehicles: Public Health and Welfare: Evidence: Words and Phrases.** The community caretaking exception to the Fourth Amendment provides that local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

14. **Constitutional Law: Police Officers and Sheriffs: Investigative Stops: Search and Seizure.** In order to determine whether the community caretaking exception to the Fourth Amendment applies, the court should assess the totality of the circumstances surrounding the stop, including all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction. If, based on the totality of the circumstances, the seizing officer had a reasonable basis to believe his assistance was necessary, the stop is not unconstitutional.

15. **Constitutional Law: Search and Seizure.** A search or seizure under the community caretaking exception to the Fourth Amendment, like any other search or seizure, is subject to the standard test of reasonableness. It must be justified at its inception, based on specific articulable facts which reasonably warrant the intrusion into the individual's liberty, and it must be reasonably related in scope to the circumstances which justified the interference in the first place.

16. **Constitutional Law: Police Officers and Sheriffs: Motor Vehicles.** As the community caretaking exception to the Fourth Amendment requires in general, transportation may be warranted and justified under the community caretaking exception when there is an objectively reasonable basis for exercising the community caretaking function.

17. **Constitutional Law: Police Officers and Sheriffs: Intoxication: Public Health and Welfare.** Depending on the particular facts presented, the community caretaking exception to the Fourth Amendment may be appropriate when a defendant is visibly intoxicated and presenting a danger to himself and the general public.

18. **Constitutional Law: Warrantless Searches: Search and Seizure.** Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.

19. **Warrantless Searches: Search and Seizure: Proof.** In the case of a search and seizure conducted without a warrant, the State has the burden

of showing the applicability of one or more of the exceptions to the warrant requirement.

20. **Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Weapons: Public Health and Welfare.** During a second-tier stop as described in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), an officer is entitled, for the protection of himself or herself and others in the area, to conduct a carefully limited search of outer clothing to discover weapons that might be used to assault the officer.

21. **Police Officers and Sheriffs: Search and Seizure: Weapons: Public Health and Welfare.** The purpose of a pat-down search for weapons is the protection of the officer and other persons nearby.

22. **Constitutional Law: Police Officers and Sheriffs: Investigative Stops: Public Health and Welfare.** The protection of the officer justification applies equally to a second-tier encounter as described in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), that is warranted by the community caretaking exception to the Fourth Amendment.

23. **Constitutional Law: Criminal Law: Arrests: Search and Seizure: Probable Cause.** A valid arrest based on probable cause that a person is engaged in criminal activity is allowed by the Fourth Amendment, and if an arrest is made based upon probable cause, a full search of the person may be made incident to that arrest.

24. **Search and Seizure: Arrests: Search Warrants: Warrants: Probable Cause.** A search without a warrant before an arrest, also without a warrant, is valid as an incident to the subsequent arrest if (1) the search is reasonably contemporaneous with the arrest and (2) probable cause for the arrest exists before the search.

25. **Police Officers and Sheriffs: Arrests: Search and Seizure: Weapons: Evidence.** A search incident to arrest is not limited to searching the arrested person for weapons only; an officer may search for and seize any evidence on the arrestee's person, even if such evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence.

Petition for further review from the Court of Appeals, Moore, Chief Judge, and Pirtle and Arterburn, Judges, on appeal thereto from the District Court for Lancaster County, Robert R. Otte, Judge. Judgment of Court of Appeals affirmed.

Matthew K. Kosmicki for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. NATURE OF CASE

Defendant was arrested after law enforcement stopped and searched his person and belongings, including the inside of a flashlight, and ultimately found illegal drugs and brass knuckles. Following denial of his motion to suppress and a stipulated bench trial, defendant was convicted of three counts of possession of a controlled substance, a Class IV felony, and one count of possession of a deadly weapon by a prohibited person, a Class III felony. Defendant appealed his convictions to the Nebraska Court of Appeals, and the court, applying the narrow community caretaking exception, affirmed. We granted defendant's petition for further review.

## II. BACKGROUND

On September 15, 2016, Steven F. Shiffermiller was charged with three counts of possession of a controlled substance, each count a Class IV felony, and one count of possession of a deadly weapon, a Class III felony. Shiffermiller entered a plea of not guilty and filed a motion to suppress the evidence obtained during his detention and subsequent arrest. A hearing on the motion to suppress was held on March 8, 2017, and the following evidence was adduced.

At approximately 4:30 a.m. on June 6, 2016, the Lincoln Police Department received a report that two individuals were fighting near the intersection of South 31st Street and Sequoia Drive. When an officer arrived on the scene, Shiffermiller was walking toward a parked car with its trunk open on the north side of Sequoia Drive. Shiffermiller appeared to have a torn shirt and blood on his face, arm, and knuckles. Wearing camouflaged printed pants and a tank top, Shiffermiller matched the description of one of the individuals from the police report.

An officer approached Shiffermiller, asking whether he was injured and stating that there had been a reported altercation

at that location. Shiffermiller appeared to be angry, agitated, and under the influence of drugs or alcohol. According to the officer, he claimed that he had been "boxing trees" in a nearby park and was not involved in a fight. The officer then asked Shiffermiller to sit down, as he appeared to be unable to stand. A few minutes later, three more officers arrived on the scene.

Shiffermiller stated that he wanted to leave, but was told that he was not free to leave and that he would stay until the situation was investigated. Because Shiffermiller was acting uncooperative, he was placed in handcuffs and was seated on the curb while officers searched for the other party involved in the reported fight. Shiffermiller's cell phone was lying in the middle of the intersection. A "ball cap" was also found in the intersection; Shiffermiller denied that it belonged to him. No other party was found, so, after approximately 30 to 40 minutes, the officers discontinued their investigation of the potential assault.

The officers determined that Shiffermiller should be transported somewhere both for his safety and to avoid any further disturbances or issues. Shiffermiller rejected medical attention and indicated that he wanted to walk home. The officers did not want to leave Shiffermiller alone, in fear that he may cause further disturbances or attempt to operate his car. Because he appeared to be under the influence of alcohol or drugs, they were worried about his ability to care for himself and were concerned for the safety of the public if he chose to drive. Eventually, the officers found contact information for Shiffermiller's father, who agreed that Shiffermiller could be brought to his home.

In preparing to transport Shiffermiller to his father's home, two police officers patted Shiffermiller down to make sure he did not have any weapons before placing him in a police cruiser. The officers testified that the pat-down was conducted for officer safety reasons, because Shiffermiller had potentially been in a fight and it was unclear whether weapons had been

involved. During the pat-down, an officer felt an object in Shiffermiller's pocket that he "immediately recognized" to be brass knuckles. The officer extracted the brass knuckles from Shiffermiller's pocket and noticed that there was a small trace of blood on them. He seized the object, and Shiffermiller was placed under arrest.

A search of the police database conducted in one of the officer's cruisers revealed that Shiffermiller had a previous felony conviction, which meant that the arrest related to the brass knuckles became a felony arrest as opposed to a misdemeanor. The officers then determined that Shiffermiller would be transported to jail and informed Shiffermiller's father of the change in circumstances.

Shortly after or nearly contemporaneous to the discovery of the brass knuckles, the officers conducted a complete search of Shiffermiller's person, finding keys and a flashlight in Shiffermiller's right pocket. The officer who found the flashlight noticed that it "rattle[d]" and that he "could just feel there weren't batteries inside." He opened the flashlight and found several pills and a small baggie of marijuana. Shiffermiller did not produce a prescription for the pills. The officers checked the pills, which had identifying markings, and confirmed that they were controlled substances. At that time, Shiffermiller was also placed under arrest for possession of a controlled substance. According to the officers present at the scene of the arrest and Shiffermiller's father, approximately 45 minutes to 1 hour passed between the initial stop and Shiffermiller's arrest. The district court overruled Shiffermiller's motion to suppress.

On April 25, 2017, a stipulated bench trial was held. At this trial, Shiffermiller renewed his motion to suppress, which was again overruled by the district court. The State offered two exhibits that were accepted into evidence, one a complete set of police reports and a laboratory report regarding the June 6, 2016, arrest and the other a certified copy of Shiffermiller's prior felony conviction. The parties stipulated that if witnesses

were called to testify in this matter, they would testify consistently with the information contained in those exhibits. The parties also stipulated as to the necessary foundation for the first exhibit which established venue and the chain of custody for the brass knuckles and the narcotics seized at the time of the arrest.

The district court found Shiffermiller guilty on each count alleged. On June 1, 2017, Shiffermiller was sentenced to jail for a period of 50 days on each count and ordered credit for 117 days already served in jail. The court then placed Shiffermiller on probation for a period of 1 year on count I, 2 years on count II, 3 years on count III, and 4 years on count IV, to run concurrently.

Shiffermiller appealed to the Nebraska Court of Appeals, asserting that the district court erred in overruling his motion to suppress the evidence obtained on June 6, 2017. The Court of Appeals affirmed the district court's decision, applying the "community caretaking" exception to the Fourth Amendment to justify Shiffermiller's continued detention after officers completed their initial investigation related to the reported altercation.[1] Shiffermiller petitioned this court for further review of the Court of Appeals' decision, alleging it erred in concluding that evidence found on Shiffermiller's person was properly admitted.

## III. ASSIGNMENTS OF ERROR

Shiffermiller assigns that the district court erred in failing to suppress evidence because (1) the government exceeded the permissible scope and duration of a stop pursuant to *Terry v. Ohio*[2] and (2) the warrantless search of Shiffermiller violated the Fourth Amendment because law enforcement did not have a reasonable suspicion that Shiffermiller was armed and dangerous and there was no basis in law to justify the search of his flashlight.

---

[1] *State v. Shiffermiller*, 26 Neb. App. 250, 265, 919 N.W.2d 163, 176 (2018).

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

## IV. STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review.[3] Regarding historical facts, we review the trial court's findings for clear error.[4] But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[5] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.[6]

[3] The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.[7]

## V. ANALYSIS

Shiffermiller asserts that the district court and Court of Appeals erred in finding that the stop did not exceed the permissible scope and duration of a *Terry* stop and in determining the search of Shiffermiller, including the inside of his flashlight, was proper under the Fourth Amendment.[8] In sum, he argues that the court erred in concluding that Shiffermiller's rights were not violated in such a manner that required the suppression of the evidence gathered during the stop and subsequent search. Because we also find that Shiffermiller's Fourth Amendment rights were not violated, we affirm.

---

[3] *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013).

[4] *Id.*

[5] *Id.*

[6] *State v. Rivera*, 297 Neb. 709, 901 N.W.2d 272 (2017).

[7] *State v. Botts*, 299 Neb. 806, 910 N.W.2d 779 (2018).

[8] See *Terry v. Ohio, supra* note 2.

### 1. Initial Detention

Shiffermiller first contends that the district court erred in overruling his motion to suppress because the police officers exceeded the permissible scope and duration of a second-tier *Terry* stop. He argues that the stop in this case falls within the third tier described in *State v. Van Ackeren*,[9] an arrest, because of its highly intrusive and lengthy nature. And, as a result, the officers did not have the requisite probable cause to justify Shiffermiller's detention, necessitating suppression of the evidence collected during the illegal stop. We disagree.

[4-7] To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *Van Ackeren*, which describes the three levels, or tiers, of police-citizen encounters. The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning.[10] This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. The second category, the investigatory stop, as defined by the U.S. Supreme Court in *Terry*,[11] is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning.[12] This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or

---

[9] *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993).

[10] *Id.*

[11] *Terry v. Ohio, supra* note 2.

[12] *State v. Van Ackeren, supra* note 9.

detention.[13] The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.[14] As noted, only the second and third tiers of police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.[15]

[8,9] A detention may evolve into a de facto arrest if unreasonable force is used or if a stop lasts for an unreasonable amount of time.[16] We have noted that there is often a gray area between investigatory detentions and arrests.[17] In *State v. Wells*,[18] we stated that whether a detention is reasonable under the circumstances depends on a multitude of factors, including the factors set forth in *United States v. Jones*[19] by the Eighth Circuit. These factors include

> "the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances."[20]

[10] In *Wells*, this court considered the circumstances under which the use of handcuffs could transform a detention into a custodial arrest. Considering U.S. Supreme Court precedent, we found that the use of handcuffs has been approved when

---

[13] See *id*.

[14] *Id.*

[15] *State v. Gilliam*, 292 Neb. 770, 874 N.W.2d 48 (2016); *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015).

[16] See *State v. Wells, supra* note 15.

[17] See *id*.

[18] *Id.*

[19] *United States v. Jones*, 759 F.2d 633 (8th Cir. 1985).

[20] *State v. Wells, supra* note 15, 290 Neb. at 197, 859 N.W.2d at 327.

it was reasonably necessary to protect officer safety during an investigatory stop, but the use of handcuffs is not warranted when the facts do not justify a belief that the suspect may be dangerous.[21]

Shiffermiller argues that the police's use of handcuffs as well as a number of the above factors weighing in his favor shows that the detention was a tier-three stop. He states that there was a significant showing of police presence, through the number of both police officers and cruisers present at the scene of the stop. He argues that there was no reason for the officers to believe he was armed. Shiffermiller also asserts that he was compliant throughout the stop, despite his communicated desire to go home.

The evidence indicates that the first 30 to 40 minutes of the stop were utilized to investigate a reported physical altercation at 4:30 a.m. Shiffermiller matched the description of one of the men involved, and he was observed to have a ripped shirt with blood on his face, arms, and knuckles. When approaching, officers noted that Shiffermiller was unable to stand and appeared to be under the influence of drugs or alcohol. Shiffermiller appeared to be agitated and angry and expressed a desire to leave. An officer even testified that Shiffermiller was attempting to leave during the investigation at one point. Though the officers may not have had a concrete indication that Shiffermiller was armed, these facts supported the use of some form of control to maintain the status quo and ensure that Shiffermiller did not attempt to leave during the investigation. In addition, Shiffermiller's anger and agitation in conjunction with the evidence of blood on his person would indicate that his detention would be reasonable to ensure that Shiffermiller was not a danger to himself or others throughout the investigation. These facts provided ample justification for the manner of detention.

Shiffermiller also argues that, considering the nature of the crime and the fact that Shiffermiller was alone, the officers

---

[21] *State v. Wells, supra* note 15.

lacked a sense of urgency in their investigation and should have completed the investigation quickly. In other words, he contends that the continued detention was unreasonable in terms of its scope and length. This contention has no merit.

[11,12] An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop.[22] Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.[23] The initial portion of the stop used to investigate the reported altercation lasted approximately 30 to 40 minutes. By finding items lying in the middle of the intersection, including Shiffermiller's cell phone and an unclaimed hat, the officers acted reasonably in continuing their investigation in order to search the area to determine if anyone else was present and injured as indicated in the original report the officers had received. There is nothing in the record to indicate any lack of diligence or urgency or an abuse of discretion on the part of the investigating officers. The initial detention was not unreasonable, highly intrusive, or excessive in length. As a result, we find that the initial detention and investigation, consisting of the first 30 to 40 minutes of the stop used to investigate the reported assault, were reasonable and did not amount to a de facto arrest.

## 2. CONTINUED DETENTION

Shiffermiller, citing *U.S. v. Maltais*[24] as authority, argues that an investigative detention may turn into an arrest if it "'lasts for an unreasonably long time.'"[25] He asserts that although the officers testified that they believed that Shiffermiller may have been under the influence of drugs, nothing was done to determine whether he was actually impaired. Therefore, his continued detention after the initial investigation of the

---

[22] *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011).

[23] *Id.*

[24] *U.S. v. Maltais*, 403 F.3d 550 (8th Cir. 2005).

[25] Brief for appellant at 14.

reported altercation was improper and unconstitutional under the Fourth Amendment.

Here, there was a valid indication that a crime had been committed when the officers initially contacted Shiffermiller after a fight had been reported. Above we found that the officers engaged in a reasonable investigation of that crime that did not violate Shiffermiller's Fourth Amendment rights. However, after the initial investigation into the reported physical altercation yielded no further evidence of a crime's having been committed, the officers continued to detain Shiffermiller for "safety purposes."

[13] Based on the absence of any evidence that a crime had been or was being committed after the initial criminal investigation was completed, this court must determine whether any exceptions to the Fourth Amendment apply to justify Shiffermiller's continued detention for the remainder of the stop.[26] One such exception is the community caretaking exception, first recognized by the U.S. Supreme Court in *Cady v. Dombrowski*[27] and later adopted by this court in *State v. Bakewell*.[28] The exception provides that

> "[l]ocal police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[29]

[14,15] In *Bakewell*, we adopted and applied the community caretaking exception to determine whether the stop of a

---

[26] See *State v. Rohde*, 22 Neb. App. 926, 864 N.W.2d 704 (2015).

[27] *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973).

[28] *State v. Bakewell*, 273 Neb. 372, 730 N.W.2d 335 (2007).

[29] *Id*. at 376, 730 N.W.2d at 338 (quoting *Cady v. Dombrowski, supra* note 27).

vehicle was reasonable when an officer stopped its driver at 3:15 a.m. after the officer observed the vehicle stop and decelerate considerably five times within approximately 90 seconds while traveling down the highway, with the vehicle eventually pulling off onto the shoulder of the road. In that case, we held that in order to determine whether the community caretaking exception applies, the court should assess the totality of the circumstances surrounding the stop, including all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction.[30] If, based on the totality of the circumstances, the seizing officer had a reasonable basis to believe his assistance was necessary, the stop is not unconstitutional.[31] Thus, a search or seizure under the community caretaking exception, like any other search or seizure, is subject to the standard test of reasonableness. It must be justified at its inception, based on specific articulable facts which reasonably warrant the intrusion into the individual's liberty, and it must be reasonably related in scope to the circumstances which justified the interference in the first place.[32]

The community caretaking exception should be narrowly and carefully applied to avoid its abuse.[33] The Court of Appeals has applied the exception in cases involving an exigency or need to protect or assist an occupant of a vehicle, mirroring our application in *Bakewell*.[34]

Insofar as Shiffermiller was not occupying a vehicle at the time of the stop, the facts of this case are different from those of prior cases in which we have applied the community caretaking exception. Our courts have never addressed whether the

---

[30] *State v. Bakewell, supra* note 28.

[31] See, *State v. Rohde, supra* note 26; *State v. Smith*, 4 Neb. App. 219, 540 N.W.2d 347 (1995).

[32] *U.S. v. King*, 990 F.2d 1552 (10th Cir. 1993).

[33] *State v. Bakewell, supra* note 28.

[34] See, e.g., *State v. Rohde, supra* note 26; *State v. Smith, supra* note 31.

community caretaking exception applies when those needing protection are located outside a vehicle. In *Dombrowski*, the Supreme Court clearly stated that the community caretaking exception was manifested in contemplation of the "extensive regulation of motor vehicles and traffic" and the frequency of local police officers' investigations that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[35]

Nonetheless, it was the general public that the Supreme Court sought to protect when first applying this exception.[36] A number of federal courts have applied the community caretaking exception to apparently intoxicated individuals who were not occupants of vehicles.[37]

For example, the Fifth Circuit in *U.S. v. Rideau*[38] applied the community caretaking exception when officers stopped an individual who was wearing dark clothing and was standing and stumbling in the road at approximately 10:30 p.m.[39] The court held that the officers were justified in detaining the individual, even without suspicion of criminal activity, because they were engaging in local community caretaking functions.[40] The court explained that intoxicated people in public streets pose a hazard to themselves and others.[41]

---

[35] *Cady v. Dombrowski, supra* note 27, 413 U.S. at 441.

[36] See, generally, *Cady v. Dombrowski, supra* note 27.

[37] *U.S. v. Rideau*, 949 F.2d 718 (5th Cir. 1991), *reversed on rehearing on other grounds* 969 F.2d 1572 (5th Cir. 1992); *Samuelson v. City of New Ulm*, 455 F.3d 871 (8th Cir. 2006); *Winters v. Adams*, 254 F.3d 758 (8th Cir. 2001); *Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007).

[38] *U.S. v. Rideau, supra* note 37.

[39] See, also, *U.S. v. Rideau*, 969 F.2d 1572 (5th Cir. 1992) (recognizing that community caretaking exception serves as justification for police removing intoxicated people from public streets where they pose hazard to themselves and others).

[40] See, *U.S. v. Rideau, supra* note 39; *U.S. v. Rideau, supra* note 37.

[41] *U.S. v. Rideau, supra* note 37.

In *Winters v. Adams*,[42] officers stopped and searched an apparently intoxicated individual when the individual was observed exiting and reentering a vehicle that was parked on a dead-end street. The Eighth Circuit Court of Appeals found that the officers "'would have been derelict in their duties'" had they not detained the individual.[43] In addition, in later cases, the Eighth Circuit has continuously recognized that the "'community caretaking'" exception may justify noninvestigatory searches and seizures in certain limited situations, including when law enforcement officers are seeking to help those in danger.[44]

[16] Courts have also justified the transport in a police cruiser of potentially intoxicated individuals for their safety under the community caretaking exception.[45] For example, the Wisconsin Supreme Court in *State v. Blatterman*[46] held that, under the community caretaking exception, a police officer was justified in transporting a defendant to a hospital when the officer observed the defendant exhibiting erratic and disoriented behavior, complaining of chest pain, and wearing only a short-sleeved shirt and jeans in very cold weather.[47] The officer stated that he had concerns about alcohol use and the defendant's mental health.[48] The court found the community caretaking exception justified the detention necessary to transport the defendant to the hospital even when the defendant refused medical treatment.[49] We find that transportation may

---

[42] *Winters v. Adams, supra* note 37.

[43] *Id*. at 764 (citing *U.S. v. Rideau, supra* note 37).

[44] *U.S. v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014) (compiling cases that have applied community caretaking doctrine to noninvestigatory seizures). See, also, *U.S. v. Quezada*, 448 F.3d 1005 (8th Cir. 2006).

[45] See, e.g., *State v. Blatterman*, 362 Wis. 2d 138, 864 N.W.2d 26 (2015).

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

be warranted and justified under the community caretaking exception when there is an objectively reasonable basis for exercising such community caretaking function.

[17] Shiffermiller, while conceding that the community caretaking exception allows an officer to seize an individual when that officer reasonably believes that the individual is a danger to himself or others, argues that applying the community caretaking exception to this case would be an improper expansion of the exception, as Nebraska courts have construed the exception only in cases involving vehicle stops. We disagree. We conclude that, depending on the particular facts presented, the community caretaking exception may be appropriate when a defendant is visibly intoxicated and presenting a danger to himself and the general public.

In the present case, the evidence shows that Shiffermiller was walking toward a parked car with the trunk open. The car was determined to belong to him. He communicated his desire to go home during the investigation, and although at one point he stated that he wanted to walk, the officers reasonably believed it likely he would drive. The officers testified that Shiffermiller seemed to be agitated and under the influence of drugs or alcohol. One of the officers also stated that he felt that if someone is exhibiting signs of being under the influence, it is the responsibility of the officers to find him or her a safe place to go.

The evidence shows that the continued detention was based upon the officers' observations that Shiffermiller appeared to be under the influence of drugs or alcohol and was potentially unable to care for himself, as well as the officers' duty to protect the community from a hazard created by a person who may attempt to operate a motor vehicle while under the influence. The evidence additionally shows that after the initial investigation into the reported assault, the officers held Shiffermiller only long enough to determine where the best place would be to transport him.

Shiffermiller's intoxication, agitated state, proximity to his vehicle, and apparent inability to care for himself at the

location of the officer contact provided sufficient justification for the officers to detain Shiffermiller in order to engage in community caretaking functions. The officers had a legitimate purpose in carrying out an important noninvestigatory function by recognizing and resolving a potential threat to Shiffermiller's safety and that of the public at large.

We reiterate that the community caretaking exception is to be narrowly and carefully applied, but in view of the totality of the circumstances here presented, we find Shiffermiller's continued detention following the initial investigation of the reported assault was reasonable. Therefore, the detention was not a violation of Shiffermiller's constitutional rights.

### 3. Warrantless Search

Shiffermiller next contends that the warrantless search of his person violated the Fourth Amendment because (1) law enforcement did not have a reasonable suspicion that Shiffermiller was armed and dangerous to warrant the pat-down search and (2) there was no basis in law to justify the search of the interior of his flashlight.

[18,19] Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.[50] The search here was conducted without a warrant. Thus, to be valid, it must fall within one of the warrantless search exceptions recognized by this court.[51] The State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement.[52]

### (a) Pat-Down

We find that the pat-down, like Shiffermiller's continued detention, was lawful under the community caretaking

---

[50] *State v. Perry*, 292 Neb. 708, 874 N.W.2d 36 (2016).

[51] *Id.*

[52] *Id.*

exception. Several state courts have upheld various types of searches under the community caretaking exception, including pat-down searches of an individual before being transported, for noncriminal reasons, in a police cruiser.[53] The rationale, as the Michigan Court of Appeals explained in *People v Hannaford*,[54] is that

> [t]he Fourth Amendment was surely not intended to stand for the proposition that police officers must either abandon civilians on highways at night or transport them at the risk of personal safety, rather than transport them at reduced risk of personal safety by first subjecting them to a frisk for weapons.

The Supreme Court of Wisconsin in *State v. Kelsey C.R.*,[55] when discussing in a concurrence case law relevant to pat-down searches conducted absent an arrest under the community caretaking exception, similarly reasoned:

> [P]olice officers are sometimes called upon in the course of their duties to transport individuals who are not under arrest. Not all of those individuals will behave in such a way as to give rise to a reasonable suspicion that they are armed and dangerous. Yet they may be. And the risk to the officer's safety is considerably greater during a squad car transport than an investigative stop because the officer cannot watch the passenger's hands and cannot defend against an attack while driving the squad car. Therefore,

---

[53] See, e.g., *People v. Tobin*, 219 Cal. App. 3d 634, 269 Cal. Rptr. 81 (1990); *People v Hannaford*, 167 Mich. App. 147, 421 N.W.2d 608 (1988); *People v Otto*, 91 Mich. App. 444, 284 N.W.2d 273 (1979); *State v. Diloreto*, 362 N.J. Super. 600, 829 A.2d 1123 (2003); *Com. v. Rehmeyer*, 349 Pa. Super. 176, 502 A.2d 1332 (1985); *State v. Lombardi*, 727 A.2d 670 (R.I. 1999); *State v. Acrey*, 148 Wash. 2d 738, 64 P.3d 594 (2003); *State v. Kelsey C.R.*, 243 Wis. 2d 422, 626 N.W.2d 777 (2001).

[54] *People v Hannaford, supra* note 53, 167 Mich. App. at 152, 421 N.W.2d at 610.

[55] *State v. Kelsey C.R., supra* note 53, 243 Wis. 2d at 464, 626 N.W.2d at 797 (Sykes, J., concurring; Prosser, J., joins).

where . . . an officer has an objectively reasonable basis to transport a person in a squad car, it is not unreasonable to allow him to protect himself from assault during the transport by conducting a minimally intrusive protective frisk for weapons.

[20-22] We agree with this reasoning. It is well established that during a second-tier *Terry* stop, an officer is entitled, for the protection of himself or herself and others in the area, to conduct a carefully limited search of outer clothing to discover weapons that might be used to assault the officer.[56] The purpose of a pat-down search for weapons is the protection of the officer and other persons nearby.[57] And, in order to justify a pat-down, an officer must provide "specific [and] articulable facts [that] support an inference that the suspect might be armed and dangerous."[58] This justification applies equally to a second-tier encounter that is warranted by the community caretaking exception.

The officers did not act unreasonably when they patted Shiffermiller down to ensure he was not carrying any weapons that would endanger the officers while they transported him to his father's home. The search was reasonable under the circumstances, given that Shiffermiller matched the description of one of the men who was reported to have been in a fight, and he appeared to have a ripped shirt and blood on his person. In addition, Shiffermiller was agitated, uncooperative, hostile toward the officers, and seemingly under the influence of drugs or alcohol. One of the officers conducting the pat-down explicitly testified that he simply "wanted to make sure before [Shiffermiller] was placed into [the officer's] cruiser that there were no weapons on [Shiffermiller] in the back of [the officer's cruiser]." Shiffermiller does not assert that the

---

[56] See *Terry v. Ohio, supra* note 2. See, also, *State v. Vasquez-Arenivar*, 18 Neb. App. 265, 779 N.W.2d 117 (2010).

[57] See *Terry v. Ohio, supra* note 2.

[58] *United States v. Cole*, 628 F.2d 897, 899 (1980).

pat-down conducted was more than a minimally intrusive protective frisk for weapons.

During the pat-down search, one of the officers felt an object in Shiffermiller's left front pocket that the officer "immediately recognized . . . to be . . . brass knuckles." Under the plain feel doctrine, the findings of a lawful pat-down can establish probable cause to extend the scope of a search.[59] The legality of the remainder of the search depends upon the incriminating character of the object's being immediately apparent.[60] If a police officer lawfully pats down a suspect's outer clothing and feels an object's whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.[61]

When the officer removed the object, he confirmed that it was brass knuckles. After a search of Shiffermiller's criminal record, it was discovered that he was a convicted felon. At that point, the brass knuckles were seized and Shiffermiller was placed under arrest for possession of a deadly weapon by a prohibited person. The court did not err in overruling Shiffermiller's motion to suppress as it related to the pat-down search and the subsequent discovery of the brass knuckles.

### (b) Search of Flashlight

[23] We agree with the State that the search of the flashlight was a valid search incident to arrest. A valid arrest based on probable cause that a person is engaged in criminal activity is allowed by the Fourth Amendment, and if an arrest is made

---

[59] *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010).

[60] See *id*.

[61] *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993); *State v. Smith, supra* note 59; *State v. Craven*, 253 Neb. 601, 571 N.W.2d 612 (1997).

based upon probable cause, a full search of the person may be made incident to that arrest.[62]

Shiffermiller asserts that the search incident to arrest exception does not apply, because the officers found the flashlight and searched its interior within seconds of finding the brass knuckles. He reasons that because the search of the interior of the flashlight was only seconds after the discovery of the brass knuckles, he was not "'officially'" under arrest yet and the search could not be incident to arrest.[63] We disagree.

[24] It is well settled under Nebraska law that a search without a warrant before an arrest, also without a warrant, is valid as an incident to the subsequent arrest if (1) the search is reasonably contemporaneous with the arrest and (2) probable cause for the arrest exists before the search.[64] Both requirements were met here. Before the flashlight was discovered on Shiffermiller's person, the officers arrested Shiffermiller with probable cause due to the discovery of brass knuckles.

[25] A search incident to arrest is not limited to searching the arrested person for weapons only; an officer may search for and seize any evidence on the arrestee's person, even if such evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence.[65] The flashlight was on Shiffermiller's person; thus, it can be considered to be a valid product of a search incident to arrest.

So too were the contents of the flashlight. In *United States v. Robinson*,[66] the U.S. Supreme Court upheld the search of a crumpled cigarette package containing gelatin capsules filled with heroin. In that case, an officer testified that he felt an

---

[62] *State v. Perry, supra* note 50.

[63] Brief for appellant at 21.

[64] *State v. Perry, supra* note 50.

[65] *State v. Ranson*, 245 Neb. 71, 511 N.W.2d 97 (1994).

[66] *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973).

object in a pocket of the respondent's coat, but could not tell what the item was.[67] The officer testified that he then removed the object and found a "'crumpled up cigarette package.'"[68] The officer testified that though he did not know what was in the package, he could feel that the objects inside ""'weren't cigarettes."'"[69] The Court ultimately held that based on his coming upon the crumpled package of cigarettes in the course of a lawful search, the officer was entitled to inspect the contents of the package.[70] And, because the inspection revealed heroin capsules, the officer was entitled to "seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct."[71]

The facts of this case mirror those of *Robinson*. The officer shook the flashlight and testified that it rattled as if something was inside. He noted that the weight of the flashlight was unusual and that it felt as though there were no batteries inside. Applying the U.S. Supreme Court's reasoning utilized in *Robinson*, the search of the interior of the flashlight was reasonable and lawful under the circumstances as a search incident to arrest.

We find that the search of the flashlight was a lawful search incident to arrest and, as a result, that the trial court did not err in overruling Shiffermiller's motion to suppress the evidence found in the flashlight.

## VI. CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Appeals affirming that of the district court.

Affirmed.

---

[67] *Id.*

[68] *Id.*, 414 U.S. at 223.

[69] *Id.*

[70] See *United States v. Robinson, supra* note 66.

[71] *Id.*, 414 U.S. at 236.