IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. KNIGHT


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

JUSTIN L. KNIGHT, APPELLANT.


Filed March 24, 2020.    No. A-19-274.


Appeal from the District Court for Scotts Bluff County: LEO P. DOBROVOLNY, Judge. Affirmed.

Katy A. Reichert, of Chaloupka, Holyoke, Snyder, Chaloupka & Longoria, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.


PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Scotts Bluff County District Court, Justin L. Knight was convicted of and sentenced for possession of 190.84 grams of methamphetamine (meth) with intent to distribute, possession of a defaced firearm, and possession of a firearm by a felon. Knight appeals the denial of a motion to suppress and the sufficiency of evidence for his convictions; he also claims his trial counsel was ineffective in several ways. We affirm his convictions.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

On January 16, 2018, the State charged Knight in the county court for Scotts Bluff County with possession of a controlled substance with intent to distribute (more than 140 grams of meth) (Count I), possession of a defaced firearm (Count II), possession of a firearm by a felon (Count III), use of money to violate drug laws (Count IV), and use of a vehicle to violate drug laws (Count V). Finding probable cause for each count, the county court bound the case over to the district court where, on February 1, the State charged Knight as it had in county court.

On March 21, 2018, Knight filed a motion to suppress all evidence seized by law enforcement on or about the date of his offense during an alleged illegal search. On June 28, Knight filed another motion to suppress regarding (1) the initial contact, stop, and/or seizure concerning Knight and his co-defendants, (2) any statements of Knight (to law enforcement) that the State intended to introduce at trial, and (3) all evidence gathered as a result of any contact, stop, seizure, and/or interview obtained by the State. During the September hearing on the motion to suppress, Knight's trial counsel said the challenge was only to "the stop and the search"; evidence was adduced regarding that matter. Near the end of the hearing, the district court asked Knight's counsel if the defense was withdrawing the challenge concerning statements Knight had made. Knight's counsel denied that the defense was withdrawing that part of the (second-filed) motion to suppress. The court asked, "We are just not doing that today?"; Knight's counsel agreed. Knight's motion was later overruled.

### 2. TRIAL

A jury trial took place on December 19 and 20, 2018, on Counts I through III (Counts IV and V were later dismissed by the State). The State presented evidence and then rested. The defense rested without offering any evidence. A summary of the relevant evidence follows.

#### (a) Events Prior to Encounter With Law Enforcement

In January 2018, Isaiah Ortgiesen was living in Colorado with Knight, his uncle. Ortgiesen testified that they made an early morning trip to Scottsbluff, Nebraska, that month using Ortgiesen's "red Dodge Ram" truck (red truck); Knight drove. Knight "flat out" told Ortgiesen that the purpose of the trip was to "do a drug run." They stayed at a hotel in Scottsbluff (a hotel receipt shows the stay was from January 9 at 4:54 a.m. to January 11). Knight left the hotel at some point with the red truck; Ortgiesen recalled Knight said something about going to "Misty's trailer" (referring to Misty Yekel, also known as Misty Bailey). Knight returned at "maybe" 10 a.m. and then he and Ortgiesen went to Fort Morgan, Colorado, because Ortgiesen had to go to work there; in the meantime, Knight kept Ortgiesen's red truck.

Yekel testified that she resides in a trailer park in Scottsbluff. She admittedly had been involved with meth for years. Yekel said Knight visited her trailer in January 2018, during the day. Yekel identified exhibits 23 and 24 as text messages between her and Knight on January 9 "in reference to the money." Exhibits 23 and 24 show the text messages were exchanged from about noon to 1 p.m. that day between one cell phone number (Yekel's) and another cell phone number,

which a wireless communications company representative said belonged to Knight since 2017. Knight had sent Yekel one photograph message; text messages sent after that from Yekel to Knight included three separate photographs to which Knight responded, "Thank u hun your [sic] amazing."

Yekel's testimony was that the four photographs associated with those text messages were exhibits 25, 26, 27, and 28. Yekel recognized exhibit 25 as a picture Knight had sent her of "somebody" she did not know but was "supposed to send some money to"; exhibit 25 is a picture of Ryan Thomas Kubik's driver's license. Yekel said that Knight "briefly" came over and gave her about $1,300 to wire to Kubik. Because Yekel did not have an "I.D.," she had someone do it for her. Yekel identified exhibit 26 as the picture she sent to Knight of the person who she tasked with sending the money; exhibit 26 is part of a form that lists that person's name. Yekel recognized exhibit 27 as showing the amount of money that was sent; exhibit 27 is part of a form that lists "Ryan Thomas" as "RECEPTOR" of "1100." (We note that Yekel texted Knight that "$1100 is what was sent" and she had his "change.") Yekel said exhibit 28 was a receipt with the "reference number" showing the money had been wired. Yekel claimed she did not know why the money was being sent; on cross-examination she said that Knight had been talking about buying a vehicle.

According to Ortgiesen, after he finished working at 10:30 p.m. on January 9, 2018, Knight arrived in the red truck to pick him up. Another man whom Ortgiesen had never met before was in the front passenger seat; he later learned that man was Kubik. Ortgiesen said Knight "basically" told him: "you can go home or you can come with me up to Scottsbluff on a drug run, your choice, but you are not getting your truck." Ortgiesen went to Scottsbluff "out of fear of something happening." Ortgiesen saw Kubik "slip" a "huge baggie" of meth into his own pocket. They arrived in Scottsbluff at 2 a.m. on January 10 and returned to the hotel room. Ortgiesen remembered Knight had "basically" been telling Kubik they "really need[ed] to find somebody to sell this to." Knight had lived in Scottsbluff before.

At some point, Ortgiesen, Kubik, and Knight went to Yekel's trailer where Knight went inside for "maybe" 20 to 30 minutes while the others remained in the red truck. Upon returning to the hotel room, Knight left and was gone for a few hours. Knight bought a "late 80's, little Chevy half-ton pickup" at some point on January 10, 2018; Ortgiesen indicated Yekel informed Knight about "this guy to go sell dope to" in exchange for the pickup. Ortgiesen recalled seeing the meth at the hotel "shortly" after they "got it" and that Knight and Kubik were weighing it out. Ortgiesen agreed that Knight had packaged the meth and that Knight had, in the prosecutor's words, the "scales" and "baggies."

Ortgiesen said that after he woke up on the morning of January 11, 2018, Kubik got a telephone call from Knight asking them to meet him at Yekel's trailer. Knight had the red truck at the trailer so Ortgiesen and Kubik used Knight's newly acquired pickup to travel there. Ortgiesen said he again observed meth at Yekel's trailer where Knight, Yekel, and Kubik were talking about where to get rid of "this"; Ortgiesen said Knight told Yekel, "[Kubik] had got this from Colorado, like we really need to get rid of this." At some point, a man named Dalton Slunecka arrived and talked to Yekel. Then Knight and Kubik left in the red truck to go "wherever [Yekel] had told them to go."

Ortgiesen saw one exchange of meth between Knight and Yekel at some point; Yekel testified that Knight had come to her trailer with meth sometime after the wire transfer. Ortgiesen said he was also present with Kubik and Knight at a house in Gering, Nebraska, when Knight went to go talk to with a person named "Cat" in a different room; Ortgiesen was "pretty sure that's when the exchange happened between those two." Ortgiesen recalled Yekel driving him, Knight, and Kubik in the red truck to a house south of Mitchell, Nebraska, for what Knight said was "just another person to sell dope to coming from [Yekel]"; Yekel and Knight went inside the house for about 20 minutes and, upon exiting, Knight said he had sold "it." Ortgiesen heard Knight and Kubik talk about "the rest of them" and "had known about a few more exchanges" but did not "physically" see those happen. Yekel admitted she "assisted" Knight in getting rid of the meth. She recalled going with Knight, Ortgiesen, and Kubik to the residence south of Mitchell where the buyer bought "an ounce" from Knight. Later that day, Kubik bought a vehicle from someone Yekel knew.

Ortgiesen said he saw a metal gun "sticking out" from Slunecka's pocket on the night of January 11, 2018, before he, Slunecka, Knight, and Kubik went to a store via the red truck to "find sandpaper." After purchasing the sandpaper, Slunecka was taken home and the others "went to another house that [Knight] had taken [them] to" where they met two individuals, one of whom Knight knew from previously living in Scottsbluff. Ortgiesen saw Knight and Kubik sanding the serial number on the gun that had come from Slunecka. Ortgiesen said exhibit 16 depicted that gun.

At some point in the early morning hours of January 12, 2018, Ortgiesen, Knight, and Kubik were at "Keno," a bar with gambling. Ortgiesen said they were there for "not even five minutes" before law enforcement arrived (Knight had gone inside). Ortgiesen, Knight, and Kubik had just crossed the street from Western Travel Terminal (WTT), a gas station and convenience store.

(b) Encounter With Law Enforcement and Subsequent Events

Exhibit 21, which was published to the jury, is a surveillance video timestamped from shortly before midnight on January 11, 2018, outside of WTT, as identified by a WTT store manager. Exhibit 21 shows the red truck parked at a gas pump before its three occupants exit the red truck in a delayed succession. In reference to exhibit 21, Deputy Matt Dodge of the Scott's Bluff County Sheriff's Office testified that Kubik exited the front passenger's side of the red truck, Knight got out of the driver's side, and Ortgiesen exited from the backseat. Exhibit 21 shows all three men return to the red truck, which then appears to depart WTT.

Deputy Dodge was on a work break at WTT with "Trooper Buxbaum, Deputy Velke, and Deputy Adkins" on January 11, 2018, from about 11:30 p.m. to midnight. Deputy Dodge said that during his break he saw "some males" walking to the bathroom counting "large sums" of cash (by trial, Deputy Dodge did not believe he had identified the first person he observed but said he had identified the second person as Kubik). Deputy Dodge left WTT after that, but soon received a text message from Deputy Velke who said he saw the "suspicious people" go to "Lucky Keno, the Frontside Bar." Deputy Dodge arrived at the bar shortly thereafter.

Exhibit 29, Deputy Dodge's body camera video, was published to the jury. Deputy Dodge testified that he approached the passenger's side of the red truck, which was running; the front passenger rolled down a window. Deputy Dodge said Kubik was in the front passenger seat, and Ortgiesen was in the backseat. Exhibit 29 shows Deputy Dodge approach the red truck. Ortgiesen or Kubik tell the deputy they were waiting for their "driver" named "Justin." Ortgiesen said he was the owner of the red truck and agreed to exit it and provide his identification. Around that time, the deputy flashed a light into the window of red truck. Deputy Dodge testified that he saw a digital scale in the center console and a set of wood pistol grips in the ashtray; the deputy recognized exhibit 19 as a photograph of those items as he had seen them at that time.

Deputy Dodge recalled Kubik "picked up a bottle of vodka" and said it was his. Exhibit 29 shows Kubik was then asked to step outside the red truck. Kubik agreed to a pat down search upon which suspected meth was found on his person in his pocket. Kubik said that Knight was inside the bar (Knight had not yet been present); other deputies retrieved Knight. Once Knight was outside, he agreed to a pat down search (during trial, Deputy Dodge denied that money or drugs were found on Knight's person). Knight denied that he was the "driver" of the red truck or that he knew what happened. However, Knight told Deputy Dodge that his cell phone was ringing (inside the red truck); at trial, Deputy Dodge identified a cell phone depicted in exhibit 20 as one that Knight claimed was his (Ortgiesen recognized exhibit 20 as being a cell phone on the console in the front of the red truck, but that it "could be any one of our cell phones"). The video depicts Kubik and Ortgiesen being handcuffed and taken to a patrol car before Knight was brought outside, and it shows Knight being told he was being detained. The video ends after Knight said it was his cell phone that was ringing inside the red truck.

Thereafter, law enforcement conducted a search of the red truck in which the following items were found: two digital scales, one bearing "white residue"; a bottle of partially consumed vodka; wood pistol grips; ".38 special" ammunition; gun cleaning tools; an "undercover .38 special defaced serial number" gun, found disassembled inside a plastic sack with the insignia of a store; sandpaper; suspected meth, found on Kubik's person and found in a "small" yellow plastic bag inside the red truck; a black bag containing 94 "small" plastic yellow bags; 14 empty black plastic bags; a "small" plastic bag of 12 "Trazodone" pills; a glass bong with white residue; and a butane torch. The suspected meth tested positive for meth with a total net weight of 190.84 grams.

Sergeant Matthew Holcomb of the Scotts Bluff County Sheriff's Office interviewed Knight on January 12, 2018, after he was arrested. Exhibit 22 is an audio recording of that interview, which was published to the jury. As heard at the outset of the interview, Knight was read his *Miranda* rights, which he waived. During the interview, Knight admitted to dropping off a quarter to a half ounce of meth to Yekel and leaving a quarter ounce of meth at another person's house in Gering; Knight denied selling to anyone else. Knight claimed Kubik "did his own stops" and that he (Knight) "stayed out of it." Knight denied knowing about the gun in the red truck.

### 3. JURY VERDICT, SENTENCING, AND APPEAL

The case was submitted to the jury on December 20, 2018. Later that same day, the jury returned its verdict finding Knight guilty of Counts I, II, and III. As to Count I, the jury found that

the weight of the meth was 190.84 grams. The district court accepted the verdict and found Knight guilty of those three counts.

On February 13, 2019, the district court sentenced Knight to concurrent terms of 20 to 20 years' imprisonment on Count I, 0 to 2 years' imprisonment on Count II, and 3 to 5 years' imprisonment on Count III; Knight received 393 days' credit for time served. Thereafter, upon the State's motion, Counts IV and V were dismissed with prejudice.

Knight appeals.

## III. ASSIGNMENTS OF ERROR

Knight claims, consolidated and restated, that (1) the trial court erred by denying his motion to suppress, (2) there was insufficient evidence to support his convictions, and (3) his trial counsel was ineffective in various ways.

## IV. STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). Regarding historical facts, we review the trial court's findings for clear error. *Id.* But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *Id.* When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress. *Id.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Knight argues that the district court erred by overruling his motion to suppress. In denying that motion, the district court found that law enforcement's encounter with Ortgiesen and Kubik was one outside the realm of protection of the Fourth Amendment to the U.S. Constitution because, among other things, Ortgiesen "voluntarily" stepped out of the red truck when asked to do so. "No

one in the [red truck]" (Ortgiesen or Kubik) was "seized" at that point. The district court stated that Deputy Dodge then saw the digital scale in the red truck, giving rise "at the least to reasonable suspicion if not probable cause." The district court found that Kubik was removed from the red truck and "in the allowable weapons search" that ensued, Deputy Dodge detected the "'feel' of contraband" in his pocket. The "large quantity of suspected meth" gave the officers probable cause to arrest and search "the [red truck] and its occupants." The district court concluded that no warrant was required and that there was no Fourth Amendment violation. The district court added it had "not researched standing to any extent."

Knight argues that the district court's ruling was wrong because he believes Deputy Dodge was required to have, but did not have, reasonable suspicion to "detain Ortgiesen and Kubik." Brief for appellant at 19. Knight asserts that the "investigatory stop and seizure of the occupants of the [red truck]" was therefore unlawful such that evidence obtained as a result of the "illegal seizure of Ortgiesen and Kubik" should have been suppressed. *Id.* at 22. His argument is contained to that matter. The State counters that denying Knight's motion to suppress was not erroneous because Knight lacked standing to challenge the "seizure of Kubik and Ortgiesen." Brief for appellee at 13.

The Fourth Amendment protects individuals against unreasonable searches and seizures by the government. See *State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018). A search for Fourth Amendment purposes occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable, and a seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property. See *State v. Nolt, supra*. To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment, an appellate court employs an analysis, which describes the three levels, or tiers, of police-citizen encounters. See *State v. Shiffermiller, supra* (describing nature of three tiers). It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001).

Prior to analyzing an alleged seizure under that three-tiered analysis, an appellate court must determine that a defendant has standing to raise his or her Fourth Amendment challenge. A party must have standing in a legal controversy to challenge a search and seizure without a warrant. See *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011). A standing analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment. See *State v. Nelson, supra*. See, also, *State v. Van Ackeren*, 194 Neb. 650, 235 N.W.2d 210 (1975) (in order to have standing to raise Fourth Amendment rights individual must show he has been injured by search or seizure (invasion of property or privacy rights), not merely by use of evidence).

It is elementary that one has a reasonable or legitimate expectation of privacy in one's own body; thus, one has standing to contest the search of his or her own person. See *State v. Stott*, 243 Neb. 967, 503 N.W.2d 822 (1993). However, it is manifest that one lacks standing to object to the search of another. *State v. Stott, supra*. See, also, *State v. Smith*, 226 Neb. 419, 411 N.W.2d 641 (1987) (Fourth Amendment rights are personal rights which may not be vicariously asserted); *State*

*v. Valdez*, 5 Neb. App. 506, 562 N.W.2d 64 (1997) (defendants lacked standing to challenge stop of third party, a suspected drug offender, and search of that third party's vehicle that occurred shortly after third party departed defendants' residence alone; neither stop nor search was directed toward either defendant). Moreover, a defendant in a criminal case has no standing to assert Fourth Amendment claims merely because evidence may have been obtained as the product of the invalid arrest of a third person. See *State v. Van Ackeren, supra*.

Knight does not have standing to challenge the validity of the seizure of Ortgiesen and Kubik because any seizure of Ortgiesen and/or Kubik (regardless of its lawfulness) did not infringe an interest personal to Knight in violation of the Fourth Amendment. See *State v. Nelson, supra*. Just as Knight has no standing to complain of any search of Ortgiesen or Kubik, Knight has no standing to dispute a seizure of those individuals. See, *State v. Stott, supra* (no standing as to search of third party's person); *State v. Van Ackeren, supra* (no standing to challenge arrest of third person that did not invade constitutional or statutory rights of defendant); *State v. Shiffermiller, supra* (arrest constitutes seizure). We note that to the extent Ortgiesen and Knight were unconstitutionally stopped and seized, Knight was inside the bar and not present at the time of relevant contact between law enforcement and Ortgiesen and Knight. See *State v. Valdez, supra* (neither stop nor search of third party and her vehicle was directed toward defendants, who were not present at time of stop and search).

The district court's reason for denying Knight's motion to suppress rested solely on an application of the three-tiered seizure analysis. We conclude that Knight lacks standing to contest the lawfulness of any seizure of Ortgiesen and/or Kubik. We find no error by the district court in its denial of Knight's motion to suppress, albeit on different grounds. See *State v. Alarcon-Chavez*, 295 Neb. 1014, 893 N.W.2d 706 (2017) (when record demonstrates decision of trial court is correct, although such correctness is based on different grounds from those assigned by trial court, appellate court will affirm).

### 2. SUFFICIENCY OF EVIDENCE

Knight claims the evidence was insufficient for his convictions. We address each conviction in turn.

### (a) Possession of Meth With Intent to Distribute

Knight was convicted of possession of meth with intent to distribute. As relevant, under Neb. Rev. Stat. § 28-416(1)(a) (Supp. 2017), it is unlawful to knowingly or intentionally possess with intent to distribute a controlled substance. Meth is a controlled substance. See Neb. Rev. Stat. § 28-405, Schedule II(c)(3) (Supp. 2017). "Distribute" means to "deliver other than by administering or dispensing a controlled substance." Neb. Rev. Stat. § 28-401(9) (Supp. 2017). "Deliver or delivery" means the "actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." § 28-401(12). Any person who violates § 28-416(1) with respect to meth in a quantity of 140 grams or more is guilty of a Class IB felony. § 28-416(10)(a).

Knight concedes that the weight of the meth involved was 190.84 grams but complains that the State relied on "nothing but circumstantial evidence" to show he "in some way possessed the

- 8 -

meth that was in Kubik's pocket." Brief for appellant at 23. He believes the sole logical inference supported by the evidence is that he possessed only 49 grams of meth, as that is the amount he says the evidence showed he sold to three people.

A person possesses a controlled substance when he or she knows of the nature or character of the substance and of its presence and has dominion or control over it. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). Possession can be either actual or constructive, and constructive possession of an illegal substance may be proved by direct or circumstantial evidence. *Id.* A defendant's control or dominion over premises where a controlled substance is located may establish the defendant's constructive possession of the controlled substance. See *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991). Mere presence at a place where a controlled substance is found is not sufficient. *Id.* Instead, the evidence must show facts and circumstances which affirmatively link the defendant to the controlled substance so as to suggest that he or she knew of it and exercised control over it. See *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011).

Given the verdict of the precise weight of the meth involved (190.84 grams), Knight's conviction was necessarily based upon the meth seized by law enforcement from Kubik's person and from inside the red truck. Knight's argument is premised upon the same understanding. The issue here is whether there was sufficient evidence from which a jury could find that Knight, even though he may not have been in actual possession of the meth when it was seized, was nevertheless in constructive possession of the meth. In other words, did the facts and circumstances affirmatively link Knight to the meth so as to suggest that he knew of it and exercised control over it. See *State v. Howard, supra*.

A rational trier of fact could have reasonably deduced the following from the evidence. Knight was in Scottsbluff from January 9 to 11, 2018, to do a "drug run," as described by Ortgiesen. With Yekel's help, Knight wired $1,100 to Kubik by about 1 p.m. on January 9 (Knight had briefly visited with Yekel prior to that). The night of January 9, Knight and Kubik were in the red truck when they picked Ortgiesen up from work; Ortgiesen saw Kubik had a "huge baggie" of meth on him around that time and, according to Ortgiesen, Kubik told Ortgiesen and Knight that the substance in the bag was meth. A jury could have reasonably deduced that the wire transfer completed earlier that day at Knight's request was to pay for part or all of the meth that Kubik had on his person later that evening.

Further, Knight exercised control over the meth itself and over the locations where it was kept. Ortgiesen said he saw Knight and Kubik weighing out small amounts of meth from a "big baggie" into "little plastic baggies" in the hotel room, which was checked out in Knight's name and was where he stayed while in Scottsbluff. Knight admittedly sold a quarter to a half ounce of meth to Yekel and a quarter ounce of meth to another person (those sales were corroborated by the testimony of Ortgiesen and Yekel). Knight acknowledges the evidence shows he also sold an ounce to a third person. Knight and Kubik met with Yekel to find out where to get "rid" of the meth; the evidence reflected that Knight and Kubik had sold a relatively small amount compared to the amount they had upon arrest. Regardless of whether he owned the meth, Knight was almost always in control of the red truck to travel to, from, and within Scottsbluff for the trip he had described as a "drug run"; the red truck is where most of the incriminating evidence (including the smaller amount of meth) was found and where Kubik (who had the larger amount of meth on his person)

had been sitting immediately before the law enforcement contact. Knight had continued to exercise control over the red truck and its contraband contents even after he acquired his own vehicle. There was sufficient evidence from which to deduce that Knight knew of the presence of meth and had dominion or control over it (and not solely the smaller amount he admits he sold). Therefore, there was sufficient evidence for a jury to conclude that Knight was in constructive possession of the 190.84 grams of meth. See *State v. Rocha, supra*.

Circumstantial evidence may also support a finding that a defendant intended to distribute, deliver, or dispense a controlled substance. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008). Circumstantial evidence to establish possession of a controlled substance with intent to distribute or deliver may consist of several factors: the quantity of the substance, the equipment and supplies found with it, the place it was found, the manner of packaging, and the testimony of witnesses experienced and knowledgeable in the field. *Id.* In this case, a fairly large amount of meth was seized, and accompanying seized items included two digital scales, a black bag of 94 small plastic yellow bags, 14 empty black plastic bags, and a disassembled gun. Those items were found in the red truck (or on Kubik's person, who had been inside of the truck), which the evidence reflected was used as transportation to complete the meth sales that had already taken place. A rational trier of fact could have also found that circumstantial evidence proved that Knight intended to distribute the meth that remained in his constructive possession. See *id.* See, also, *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016) (circumstantial evidence is not inherently less probative than direct evidence). In sum, there was sufficient evidence for Knight's conviction for possession of meth (190.84 grams) with intent to distribute.

(b) Possession of Firearm by Felon

Knight was convicted of possession of a firearm by a felon. As relevant here, Neb. Rev. Stat. § 28-1206(1)(a)(i) (Supp. 2017) prohibits a person previously convicted of a felony from possessing a firearm. A firearm is "any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive or frame or receiver of any such weapon." Neb. Rev. Stat. § 28-1201(1) (Supp. 2017). The parties stipulated at trial that Knight was convicted of a felony in June 2017. Knight does not dispute that the seized disassembled gun was a firearm pursuant to § 28-1201 and that there was evidence that law enforcement put the disassembled gun back together in about 5 to 10 minutes without any special tools and confirmed that it was capable of firing.

Knight argues the evidence was insufficient to prove he possessed the gun because there had to be an "independent factor" linking him to the gun "*other than* his association with Kubik, Ortgiesen, and Slunecka." Brief for appellant at 25 (italics in original). But there was other evidence from which a rational jury could reasonably conclude that Knight possessed the gun. According to Ortgiesen, Knight handled the firearm and, along with Kubik, tried to sandpaper the serial number off of it. Knight was the last person Ortgiesen saw with the gun. Also, the gun was seized from the red truck shortly after those described events and, as previously discussed, the evidence supports that Knight exercised control over the red truck throughout the January 2018 trip. See *State v. Long*, 8 Neb. App. 353, 594 N.W.2d 310 (1999) (possession may be proved by circumstantial evidence; defendant's control or dominion over premises at which narcotics or other

contraband is located may establish defendant's constructive possession of contraband). There was sufficient evidence for Knight's conviction for possession of a firearm by a felon.

### (c) Possession of Defaced Firearm

Knight was convicted of possession of a defaced firearm under Neb. Rev. Stat. § 28-1207(1) (Reissue 2016), which prohibits a person from "knowingly" possessing "any firearm from which the manufacturer's identification mark or serial number has been removed, defaced, altered, or destroyed." As to this offense, Knight only disputes that the firearm was defaced and argues that the serial number is "noticeable and readable" in exhibit 16. Brief for appellant at 25. However, exhibit 16, a photograph of the gun, only shows its scratched surface and the inscription of "UNDERCOVER .38 SPL.," which is not a serial number. The State also submitted exhibits 34 and 37, which clearly show that the serial number of the firearm had been "removed, defaced, altered, or destroyed." See § 28-1207(1). Deputy Dodge's testimony established that the gun was found in that condition. The photographs of the gun show a thoroughly scratched surface above the trigger of the gun, where Deputy Dodge said the serial number would otherwise be. There are five unreadable indentations in that area. There was sufficient evidence for this conviction.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Knight asserts he received ineffective assistance of trial counsel in various ways. He is represented on direct appeal by different counsel.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. See *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). Otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *Id*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

To raise a claim on direct appeal that trial counsel was ineffective, a defendant's brief must specifically set forth how counsel's performance was deficient, but it need not also allege prejudice. See *id*. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *State v. Stelly, supra*.

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Stelly, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with

ordinary training and skill in criminal law. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019). The two prongs of this test may be addressed in either order, and the entire ineffective assistance analysis should be viewed with a strong presumption that counsel's actions were reasonable. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019).

With that legal framework in mind, we will address Knight's various claims.

### (a) Failure to Impeach Witnesses

Knight argues that his trial counsel was ineffective for failing to impeach Deputy Dodge, Ortgiesen, and Yekel with their prior testimony when they gave "inconsistent answers" at the suppression hearing and trial. Brief for appellant at 26. With one exception, we will not address this claim as Knight does not allege with specificity the content of the prior inconsistent statements of any of those witnesses or the particular trial testimony at issue. See *State v. Sundquist, supra* (appellant is required to specifically assign and argue trial counsel's allegedly deficient conduct; argument that does little more than restate assignment of error does not support assignment, and appellate court will not address it).

The only specific allegation related to this claim about trial counsel failing to impeach these particular witnesses is Knight's allegation that trial counsel failed to "impeach Yekel with prior felony convictions." Brief for appellant at 27. As Knight notes, on direct examination during trial, Yekel admitted she had been convicted of a "few" felonies in the last 10 years and had been involved with meth for years. Knight cannot show he was prejudiced when the information he sought to be revealed by his counsel was already revealed upon questioning by the State. Further, trial counsel was not deficient for not asking Yekel further questions regarding her prior convictions. See, Neb. Rev. Stat. § 27-609(1) (Reissue 2016) (allows for impeachment of witness on cross-examination when witness has committed felony or crime of dishonesty); *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014) (when impeaching witness under § 27-609(1), after conviction is established, inquiry must end there, and it is improper to inquire into the nature of crime, details of offense, or time spent in prison as result thereof).

Knight also claims his trial counsel was ineffective by failing to impeach Ortgiesen with the "extremely favorable plea agreement" he received for testifying against Knight. Brief for appellant at 27. However, Knight does not state with particularity what that plea agreement was and how it would have served to impeach Ortgiesen.

The record is sufficient to address these claims of ineffective assistance of trial counsel, and they all fail for either not being raised with sufficient particularity or for other reasons discussed above.

### (b) Failure to Object to Exhibits 23 Through 28

Knight argues that his trial counsel was ineffective for failing to object to exhibits 23 to 28 on hearsay grounds. At the time those exhibits were offered, his trial counsel objected only on foundation grounds. Those exhibits, combined with Yekel's testimony about them, went to the

matter of Knight wiring money to Kubik with the help of Yekel on January 9, 2018. Even if those exhibits contained inadmissible hearsay, Knight would not be able to show that but for his trial counsel's deficient performance, the result of the trial would have been different. The same matters could have been established through Yekel's testimony alone. Therefore, this claim fails.

(c) Failure to File Motion to Exclude Statements in Exhibit 22

Knight claims that his trial counsel was ineffective for failing to file a motion in limine or a "Rule 403" motion to have Deputy Holcomb's statements regarding Knight's honesty redacted from exhibit 22 (audio recording of Knight's interview) and for failing to request a limiting instruction at trial directing that those statements "were not to be considered as substantive evidence or in considering the truthfulness of Knight's statements." Brief for appellant at 29. When exhibit 22 was offered into evidence, defense counsel objected on foundation and relevance grounds but did not object to the publication of the exhibit to the jury; our record does not contain a pretrial motion concerning exhibit 22.

The credibility of witnesses is a determination within the province of the trier of fact; it is improper for a witness to testify whether another person may or may not have been telling the truth in a specific instance. See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). Statements by law enforcement officials on the veracity of the defendant or other witnesses, made within a recorded interview played for the jury at trial, are to be analyzed under the ordinary rules of evidence. See *id.* Such commentary is not admissible to prove the truth of the matter asserted in the commentary. *State v. Rocha, supra.* But it may be independently admissible for the purpose of providing necessary context to a defendant's statements in the interview which are themselves admissible. *Id.* The police commentary must be probative and material in light of that permissible purpose of providing context to the defendant's responses. *Id.* See, also, Neb. Evid. R. 401 and 402; Neb. Rev. Stat. §§ 27-401 and 27-402 (Reissue 2016) (to be admitted at trial, evidence must be relevant, meaning it has tendency to make existence of fact of consequence to determination of action more or less probable than it would be without it). And even statements that are otherwise admissible may be excluded under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016) (Rule 403), which pertains to the exclusion of relevant evidence. See *State v. Rocha, supra.* Upon request, a defendant is entitled to a limiting instruction that such statements are to be considered only for the permissible purpose of providing context to the defendant's statements in the interview. *Id.*

Knight argues that Deputy Holcomb's statements (emphasized in bold type below) were exclusively used to call Knight's honesty into question and were inadmissible. The statements of which Knight complains are within the following five exchanges from exhibit 22.

[First Exchange]
Q [by Deputy Holcomb]: Well, why are you in Scottsbluff[?]
A [by Knight]: The truck. To buy the truck next to the red [truck].
. . . .
Q: When did you come up?
A: Today.
Q: You just came up today?

A: Yeah.

Q: . . . **Here's the deal, man. I work for the Sheriff's Office but I'm with our local drug task force. If you can help yourself out or if there's anything you can offer to help out, now is the time to--to tell me those things. So, for me to trust you and me to be willing to do anything with you here, you got to be honest with me ok--100 percent honest. Alright. If we're going to sit here and go [in] circles and play little games, I'll go back home and go back to bed, ok?**

[Second Exchange]

Q: And how did, I mean I can kind of understand why you're with [Ortgiesen]--why is [Kubik] with you guys?

A: I don't really know how that got started because [inaudible].

Q: **You realize you are looking at some serious shit, right?**

A: I know. I know. That's why I'm being 100 percent honest.

Q: **Well, I don't think you are.**

A: No, I am.

[Third Exchange]

Q: . . . How much [meth] did you have? Where were you dropping it off?

A: I have no [sic] exactly how much we had then. I just, you know, seen [sic] the bag, that's it.

Q: Ok.

A: . . . I'll be honest. That's all I seen [sic] was--you know.

Q: **Yeah. . . . You're into this deeper than you want. I--I get it . . . you want to play it off and minimize. Well, no, it's a natural thing to do. I mean, I can tell you . . . . Look, I've been doing dope for a long time. K [sic]. I know how it works. I know you don't just happen to show up in town with a half a pound of dope just on a whim. Ok. I'm offering--I'm trying to offer you a chance to--to see what you can do, see if you're serious about wanting--trying to help yourself and do something.**

A: I'm telling you, I seriously did not like[.]

Q: **Then you gotta, you gotta be a little more up front, k [sic]?**

Thereafter, Knight admitted selling meth to Yekel and another person, but denied involvement in what he said were Kubik's own "stops." The fourth exchange at issue followed:

Q: . . . **Everything you're saying is not really making sense. I mean, I get it, you're trying to minimize your role and stuff. You don't wanna [sic] tell me what all you did.**

A: No. I'm telling you everything I did. I mean, I felt the same way--I felt like, you know, I didn't--we were at the motel and [Yekel's], that's basically what it consisted of . . . the only other place we went was . . . to [other named individual].

During the fifth exchange, Deputy Holcomb told Knight that to "**help [himself] out**" he would have to be a confidential informant but indicated Knight had not given enough information to be fit for that role.

We find that Knight's statements included denials of dishonesty and of criminal conduct or association with Kubik beyond that to which he admitted; his statements were relevant to whether he committed Counts I through III. We note that Deputy Holcomb's statements of which Knight complains (emphasized in bold type) about Knight's honesty or other matters have but minimal probative value and could have only been admitted to provide context for Knight's statements. But even if the deputy's statements at issue can be categorized as having provided context for Knight's statements, admissibility of the deputy's statements would have still had to pass muster under Rule 403. See *id.* (relevant evidence may be excluded if probative value is substantially outweighed by danger of unfair prejudice). It is questionable whether the jury could have improperly relied on Deputy Holcomb's statements about Knight's honesty. See *State v. Rocha, supra* (admitting statements by officer calling into question defendant's honesty and stating conclusions about defendant's guilt carries risk of unfair prejudice). But see *State v. Huston*, 302 Neb. 202, 922 N.W.2d 723 (2019) (most, if not all, evidence offered by party is calculated to be prejudicial to opposing party). If any of Deputy Holcomb's statements presented a risk of unfair prejudice, a matter we need not decide, Knight would have been entitled to a limiting instruction that could have mitigated that risk; his trial counsel did not request one. See *State v. Rocha, supra* (limiting instruction that jurors are not to consider officer's statements within recorded interview for determining defendant's guilt may mitigate risk of unfair prejudice).

We conclude that even if Knight's trial counsel was deficient as alleged, Knight would not be able to establish prejudice based on the admission, without any limiting instruction, of Deputy Holcomb's statements within exhibit 22. There was other evidence from which the jury could have come to the conclusion that Knight minimized his criminal involvement with Kubik and in conduct relevant to the offenses at issue at trial. Namely, the jury could have reasonably questioned Knight's credibility or guilt by comparing Knight's statements within exhibit 22 (which were admissible) to all the other evidence (testimony of several individuals and varying types of exhibits) that suggested Knight was more intimately involved with Kubik in a criminal meth sale plan than the minimal criminal condut to which Knight admitted during his police interview. Further, we note that without taking into account Deputy Holcomb's statements within exhibit 22, we previously found that there was sufficient evidence for the jury to find Knight guilty of Counts I through III.

Regardless of whether Knight's trial counsel was deficient by failing to file a pretrial motion to exclude Deputy Holcomb's statements regarding Knight's veracity, the record establishes that Knight would not be able to prove that but for the alleged deficient performance, the result of the proceeding would have been different. See *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). This ineffective assistance claim fails.

### (d) Failure to Call Other Officers at Suppression Hearing

Knight claims his trial counsel was ineffective for failing to call "Deputy Velke and Trooper Buxbaum" as witnesses at the suppression hearing to contradict Deputy Dodge's

testimony regarding reasonable suspicion. Brief for appellant at 32. Knight's argument for this claim is too vague, saying only that the observations of the other officers "differed from those of [Deputy] Dodge and call into question [Deputy] Dodge's 'reasonable suspicion' that illegal activity was underfoot." *Id.* Knight does not indicate in what way the other law enforcement officers' observations differed from Deputy Dodge's observations and how any contradiction in such observations would have impacted the decision regarding his motion to suppress. This claim is not raised with sufficient particularity, and therefore, we will not address the merits of this claim. See *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019) (general allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise ineffective assistance claim on direct appeal and thereby preserve issue for later review).

### (e) Failure to Request Suppression Hearing Regarding Knight's Arrest and Subsequent Statements

Although Knight's second-filed motion to suppress contained a challenge as to Knight's statements, there was no suppression hearing to suppress that evidence. Knight claims that his trial counsel was ineffective for failing to request a suppression hearing regarding his arrest and statements made subsequent thereto. He argues his arrest was "warrantless" and that the officers "lacked probable cause to make the arrest." Brief for appellant at 33.

An arrest is a seizure of a person under the Fourth Amendment and must be justified by probable cause. See *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, which would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *State v. Seckinger*, 301 Neb. 963, 920 N.W.2d 842 (2018). The concept of probable cause, as the name implies, is based on probabilities. *Id.* It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. See *id.* Thus, to find probable cause, officers are not required to rule out all innocent explanations for suspicious facts. *State v. Seckinger, supra*.

After Deputy Dodge saw Kubik walking to the bathroom counting "large sums" of cash at WTT, he located the red truck in which Kubik was suspected to be traveling parked (yet running) outside a bar. During the suppression hearing that did take place, Deputy Dodge testified that the bar had been a high drug trafficking area for a while and that the owners had given law enforcement permission to "do a walk through at any time" to "curb the drug problem." When Deputy Dodge approached the red truck, no one was in the driver's seat. Ortgiesen informed that he and Kubik were waiting for their "driver" named "Justin" to "come out." A flash of light inside the red truck revealed the digital scale and wood pistol grips in the center console. A large amount of suspected meth was found on Kubik's person. Ortgiesen told Deputy Dodge how to identify "Justin," and, from that, Deputy Dodge instructed two officers that Knight was wearing a certain hat with sunglasses, was "about 26, 27" years old, and was named "Justin." Those officers were told to and did retrieve Knight, who fit the provided description. The body camera video suggests that Knight at first attempted to go to a different vehicle (a longer version of the video, received into evidence

during the suppression hearing, shows what appears to be a Chevy pickup parked to the left of the driver side of the red truck) but stopped when Deputy Dodge said, "No, no, no, no; stay out of the truck. Come on over here"; alternatively, Knight could have been walking to the driver's side of the red truck. While he was frisked, Knight did not deny that he knew, as Deputy Dodge put it "these guys," and instead Knight answered that he did not know what happened "while [he] was gone."

Even without information or a visual of how Knight was retrieved from inside the bar and led outside, the totality of the facts of our record refute Knight's claim that probable cause did not support his arrest. Thus, his trial counsel was not deficient for failing to request a suppression hearing regarding Knight's arrest because his motion to suppress evidence of statements relating to or subsequent to arrest would have been overruled. See *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017) (as matter of law, counsel cannot be ineffective for failing to raise meritless argument).

(f) Failure to Object to Admission of Exhibit 29

Knight asserts his trial counsel was ineffective for failing to object on hearsay grounds to the admission of exhibit 29 (Deputy Dodge's body camera video). At the time exhibit 29 was offered, Knight's trial counsel objected "as to the testimony regarding the search of the passengers in the vehicle."

Knight argues that exhibit 29 included "statements made by Deputies Dodge, Velke, and Adkins, as well as Ortgiesen and Kubik." Brief for appellant at 34. He generally says that "[a]ll but Knight's statements in the video are inadmissible hearsay as they are statements made by others and offered for the truth of the matter asserted. Had trial counsel objected to the video on the basis of hearsay, such objection would have been sustained." *Id.* Exhibit 29 is about 13 minutes long and contains several statements made by different individuals. However, as pointed out by the State, the body camera video was not offered for the truth of any matters asserted; rather, the video was offered "to show what happened and why." Brief for appellee at 24. Further, Deputy Dodge testified as to the events that unfolded as depicted by his body camera, and any prejudicial evidence (e.g. identification of Knight as the driver and discovery of meth on Kubik's person) was otherwise properly admitted through witness testimony. Knight cannot establish that he was prejudiced by the admission, without objection, to this video, and therefore, this claim fails.

(g) Failures Related to Use of Ortgiesen's Deposition Testimony

Knight argues his trial counsel was ineffective for failing to object to the improper use of Ortgiesen's deposition testimony and/or failing to request a curative instruction regarding Ortgiesen's truthfulness to the extent that the State used the same testimony to impeach Ortgiesen. Knight refers to a portion of the trial record when the prosecutor "properly refreshed" Ortgiesen's memory about when he saw meth at the hotel. Brief for appellant at 36. Knight asserts that in the exchange that followed, the prosecutor "went beyond refreshing Ortgiesen's memory and essentially testified substantively for Ortgiesen," resulting in inadmissible hearsay. *Id.* at 35.

- 17 -

The exchange at issue immediately follows Ortgiesen's review of his prior deposition testimony and answer that he would have seen the meth at the hotel "shortly after we [(he, Knight, and Kubik)] got it":

Q [by the prosecutor]. Okay. And, who was weighing it out?

A [by Ortgiesen]. [Knight] and [Kubik].

Q. Actually, I asked you, who packaged it, which one, or both. And, your answer was, [Knight], right?

A. Yeah.

Q. Okay. Were you doing your best to tell the truth back on February 28 [(date of Ortgiesen's deposition)]?

A. Yes.

Q. And, you mentioned that he had the scales and the baggies, correct?

A. Yes, I did.

Q. So at some point you end up at [Yekel]'s again; is that right?

A. Yes.

Q. And, [Knight] brings the meth into her house?

A. Yes.

Q. Trailer?

A. Yes.

Knight argues that the prosecutor's question from the colloquy above, "who was weighing it out," was a leading question and that, if objected to, would have been inadmissible. He states that the questions that followed were "improper" as well. Brief for appellant at 36. Knight further argues that if the prosecutor was using Ortgiesen's deposition to "'refresh memory'" or to show "'past recollection recorded,'" it was done "improperly." *Id.* at 37. However, even if Knight's trial counsel was deficient for failing to object to the prosecutor's line of questioning on grounds that questions were leading or constituted an improper manner of refreshing Ortgiesen's recollection, it is likely that a sustained objection would have led the prosecutor to correct his form to generate the same responses from Ortgiesen. See *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998) (rejecting ineffective assistance claim regarding trial counsel's failure to object to leading questions by State; when trial counsel had objected to some leading questions, State rephrased questions and elicited sought-after responses from witnesses). Therefore, even assuming that his trial counsel was deficient as alleged, Knight cannot show that the result of the proceeding would have been different but for that deficient performance.

Moreover, the trial record set forth above does not reflect that the deposition testimony was being used to impeach Ortgiesen, something Knight concedes in his brief. Thus, the record refutes that a limiting instruction was needed regarding consideration of inconsistent statements and supports that trial counsel was not ineffective for failing to request one. See *State v. Schwaderer, supra* (as matter of law, counsel cannot be ineffective for failing to raise meritless argument).

Knight also argues that the State violated Neb. Rev. Stat. § 29-1917 (Reissue 2016), which allows either party in a felony prosecution to request the court to allow the taking of a deposition of any person other than the defendant who may be a witness at trial. A deposition taken pursuant

to this section "may be used at the trial by any party solely for the purpose of contradicting or impeaching the testimony of the deponent as a witness." § 29-1917(4). Knight asserts that Ortgiesen's February 2018 deposition (referred to in the trial record quoted above) was "not the deposition authorized by the court on May 17, 2018." Brief for appellant at 38. Knight suggests that his trial counsel should have objected to the use of the February deposition because "the State used a deposition not authorized in the course and scope of Knight's prosecution," and this "allowed the State to skirt around this statutory rule" to use the February deposition as substantive evidence. *Id*.

The record shows that the district court entered an order on May 17, 2018, approving Knight's motion to take a deposition of Ortgiesen. The record does not show that Ortgiesen's February deposition was taken pursuant to § 29-1917. Regardless, even if the State's use of the February deposition was improper and Knight's trial counsel had made an objection to its use, as we discussed above, the prosecutor could have nevertheless elicited the same substantive information in the course of Ortgiesen's testimony by reforming the line of questioning. Therefore, even if trial counsel was deficient in this instance, Knight cannot establish prejudiced. This ineffective assistance claim fails.

### (h) Cumulative Effect of Alleged Errors of Trial Counsel

Knight claims that the cumulative effect of trial counsel's errors deprived him of a fair trial and warrants reversal of his convictions. Given our disposition of each of Knight's ineffective of assistance claims, his cumulative effect claim necessarily fails.

### VI. CONCLUSION

For the foregoing reasons, we affirm Knight's convictions.

AFFIRMED.